[No. F034241. Fifth Dist. Nov. 25, 2003.]

JUAN RAMON ROMO, Individually and as Administrator, etc., et al., Plaintiffs and Appellants, v.
FORD MOTOR COMPANY, Defendant and Appellant.

**COUNSEL**

Law Offices of Joseph W. Carcione, Jr., Joseph W. Carcione, Jr., Gerald K. Okimoto, Gary W. Dolinski and Erwin Chemerinsky for Plaintiff and Appellant Juan Ramon Romo.

Law Offices of Drivon & Tabak, Laurence E. Drivon and Erwin Chemerinsky for Plaintiffs and Appellants Maria Irene Romo and Evangelina Romo.

Esner & Chang and Stuart B. Esner for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., William E. Thomson, Thomas H. Dupree, Jr. and Miguel A. Estrada for Defendant and Appellant.

Mayer, Brown, Rowe & Maw, Donald M. Falk, Evan M. Tager; National Chamber Litigation Center and Robin S. Conrad for Chamber of Commerce of the United States as Amicus Curiae on behalf of Defendant and Appellant.

Horvitz & Levy, Ellis J. Horvitz, Mary-Christine Sungaila and Curt Cutting for The California Chamber of Commerce, The American Chemistry Council and Exxon Mobil Corporation as Amici Curiae on behalf of Defendant and Appellant.

---

## OPINION

**VARTABEDIAN, Acting P. J.**—In the wake of its decision in *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513] (hereafter *State Farm*), the United States Supreme Court granted certiorari in the present case. The court summarily vacated the judgment and remanded the case to us for reconsideration in light of *State Farm*. We have received and considered further briefing from the parties and from amici curiae and we now conditionally affirm the punitive damages portion of the judgment before us, conditioned upon plaintiffs' acceptance of reduction of the punitive damages portion of the judgment to $23,723,287. If plaintiffs timely consent to the reduction, then the judgment shall be modified accordingly and, as modified, affirmed. (Cal. Rules of Court, rule 24(d).)

## I. BACKGROUND

### A. *The Roll-over*

In *Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115 [122 Cal.Rptr.2d 139], we were presented with an appeal from the judgment in a personal injury and wrongful death case arising from a rollover accident. That opinion

contains a more detailed statement of the facts and procedural history of the case.[1] For present purposes, we summarize the facts only briefly.

The Romo family was riding in their 1978 Ford Bronco when it rolled over as plaintiff Juan Ramon Romo was trying to avoid a car that had swerved in front of him. Ramon, Salustia, and Ramiro Romo were killed in the accident when the steel portion of the Bronco's roof collapsed and the fiberglass portion shattered. Juan, Evangelina, and Maria Romo were injured.

## B. *The Trial*

In a products liability action brought by the surviving Romos individually and on behalf of the estates of the deceased family members, the jury awarded compensatory damages from Ford Motor Company (Ford) (after adjustments by the trial court) of nearly $5 million. In addition, the jury awarded the Romos punitive damages from Ford in the amount of $290 million. (Ford did not move for bifurcation of the punitive damages portion; as a result, there was a unified trial and the jury returned a single verdict on all issues.) After the trial court granted Ford's motion for new trial of the punitive damages issues based on jury misconduct, both sides appealed.

## C. *The First Appeal*

Ford raised numerous issues concerning both the compensatory damages aspect and the punitive damages aspect of the case. We concluded all of Ford's contentions were without merit. The Romos appealed from the order granting a new trial on punitive damages. We determined that the record rebutted any presumption of prejudicial juror misconduct and that the new trial motion was granted in error. The net result of the appeal was that the judgment was reinstated and affirmed.

After the California Supreme Court denied Ford's petition for review on all issues, Ford filed a petition for certiorari in the United States Supreme Court. On May 19, 2003, the court granted the petition, vacated the judgment, and

---

[1] The California Supreme Court denied defendant's petition for review and request for depublication of our original opinion on October 23, 2002. (See *Romo v. Ford Motor Co.*, *supra,* 99 Cal.App.4th at p. 1152.) Although the judgment in this case was vacated by order of the United States Supreme Court, that action affected only limited—albeit important—portions of the case. Our original opinion, except for the section of the discussion entitled "Review Under Federal Constitution" (see *id.* at p. 1149–1152), was not affected by the Supreme Court's action: the decision retains the ordinary precedential value of a published opinion of an intermediate appellate court and it remains the law of the case on all points other than the federal constitutional issue. (See generally *People v. Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211]; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309 [126 Cal.Rptr.2d 516].)

remanded the case to us "for further consideration in light of" *State Farm.* (*Ford Motor Co. v. Romo* (2003) 538 U.S. 1028 [155 L.Ed.2d 1056, 123 S.Ct. 2072].)

## II. DISCUSSION

Our effort to comply with the instructions from the United States Supreme Court has required us to reexamine the purpose and nature of punitive damages and to revisit certain pivotal California appellate cases, chief among them *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348] (*Grimshaw*). We attempt to report the results of this reexamination in as summary a fashion as the subject permits and not to write a treatise on the subject of punitive damages.

### A. *The Statute: "[F]or the Sake of Example and by Way of Punish[ment]"*

Civil Code section 3294, subdivision (a), provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Civil Code section 3295, subdivision (a), with certain restrictions, permits introduction of evidence in a punitive damages case of "[t]he profits the defendant has gained by virtue of the wrongful course of conduct of the nature and type shown by the evidence" and of "the financial condition of the defendant."

### B. *Punishment and Deterrence*

"The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 [148 Cal.Rptr. 389, 582 P.2d 980].) Of course, there are degrees of punishment and deterrence. One way to deter parking meter violations would be forfeiture of the cars of parking offenders. The law does not do that, but the law does seek to deter drug traffickers through forfeiture of cars used to transport drugs. (See Health & Saf. Code, § 11470 et seq.) Even in the case of parking meter violations, however, it cannot be disputed that the purpose of the relatively small monetary fine is to "punish wrongdoers and thereby deter the commission of wrongful acts," to borrow the phrase from *Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at page 928, footnote 13.

In the case of punitive damages, the degree of punishment and deterrence that can be exacted under state law is subject to limits arising from

the due process clause of the Fourteenth Amendment. (*State Farm, supra,* 538 U.S. at p. 412.) In reconsidering the present case in light of *State Farm,* we believe the inquiry profitably and initially may focus on two questions: first, *what* is sought to be "punished and deterred"? and, second, *how* is that action to be "punished and deterred"? While at first glance the answer to these questions seems straightforward (i.e., malicious conduct, money), consideration of California punitive damages precedent in light of the restrictions articulated in *State Farm* seems to us to require a more nuanced consideration of those answers.

### 1. *What Is to Be Deterred: Punishment of Private Wrongs*

There is a fundamental difference between parking fines and drug forfeitures, on the one hand, and punitive damages, on the other. In the former case, the exactions arise from "public" wrongs—that is, wrongs against society. ▆ In the case of punitive damages, the exaction arises from a "private" wrong: if there is no wrong resulting in compensable injury to *this* plaintiff, there can be no exaction of punitive damages. (See, e.g., *Jackson v. Johnson* (1992) 5 Cal.App.4th 1350, 1355 [7 Cal.Rptr.2d 482].) By contrast, in the case of "public" wrongs, the law seeks to enforce compliance with norms of conduct through the infliction of punishment regardless of the existence of an identifiable victim in a particular case; no one needs to be waiting for the parking space in order to justify the issuance of a parking ticket.

Moreover, in the case of "private" wrongs, our common law tradition does not seek to "punish and deter" ordinary private wrongs: normally, the sole purpose of a damages award in tort is to compensate a wrongfully injured party for injury to person or property. (See Prosser & Keeton on Torts (5th ed. 1984) § 1, p. 6 (hereafter Prosser & Keeton); see also Civ. Code, §§ 3281–3282.) If, for example, a driver negligently causes a collision in which one person in the other car is severely injured and another in the same car is uninjured, the negligent driver is required to pay damages only to the party who has suffered loss. The driver is not punished for his or her lack of due care through an award to the uninjured person. In other words, the system of compensatory damages "is concerned [merely] with the allocation of losses arising out of human activities" (Prosser & Keeton, p. 6) by requiring "the person in fault" to pay compensation for detriment suffered by another (Civ. Code, § 3281).

For more than two centuries, common law courts have recognized that certain wrongful acts constitute an affront to honor and dignity, and that this affront is not a loss that the common law normally compensates with a damages award. (Prosser & Keeton, *supra,* § 2, pp. 10–11.) Perhaps in recognition that

offenses to honor were particularly likely to result in extrajudicial retribution if not sufficiently compensated within the judicial system, common law courts permitted an award of exemplary or punitive damages in certain cases of outrageous behavior without any pretext that the award was compensating the victim for some otherwise compensable loss. (See generally Colby, *Beyond the Multiple Punishment Problem: Punitive Damages as Punishment for Individual, Private Wrongs* (2003) 87 Minn. L.Rev. 583, 614–616 [hereafter *Private Wrongs*].) "Such damages are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example." (Prosser & Keeton, *supra*, § 2, p. 9.) Even though the resulting award sought to punish the defendant rather than to compensate the plaintiff, cases recognized that the punishment was for the *particular* affront to the plaintiff, not a broader sanction for an affront to society at large. (*Private Wrongs, supra*, at p. 615.) Consequently, from an early date it was required that the punitive damages award bear some "reasonable relationship" to the individual injury and the compensatory damages awarded in the action. (*Id.*, at p. 639.)

### 2. *What Is to Be Deterred: Punishment of Quasi-Public Wrongs*

The idea of awarding punitive damages based purely on a conception of torts as private wrongs lost favor in the era of products liability litigation. In cases of mass-produced consumer goods or company-wide practices of large insurers, outrageous or malicious wrongdoing was no longer simply an affront to the dignity of a single victim. Instead, the affront was to all affected by the goods or services or, given the reach of the misconduct, the affront was viewed as one to society as a whole. In this view, because the "wrong" was directed beyond the immediate plaintiff, punitive damages awards needed to be based on the overall scope of the wrong in order to punish and deter the mass torts. (See *Private Wrongs, supra*, 87 Minn. L.Rev. at p. 603 [describing such punitive damages as "total harm" damages]; see also Mallor & Robers, *Punitive Damages: Toward a Principled Approach* (1980) 31 Hastings L.J. 639, 647–649.) As the issue became less the inadequacy of common law measures of damages as a satisfactory substitute for self-help and more a question of preventing outrageous large-scale wrongdoing, it was thought that, in order to be effective, punitive damages had to render the overall conduct unprofitable or prohibitively costly. (*Id.* at pp. 666–669; see *Cummings Medical Corp. v. Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1298–1301 [13 Cal.Rptr.2d 585, 13 Cal.Rptr. 2].)

The issue was presented to the Court of Appeal in *Grimshaw, supra,* 119 Cal.App.3d 757, the products liability action involving the Ford Pinto. There, Ford argued, as phrased by the court, "that the Legislature was thinking in

terms of traditional intentional torts, such as, libel, slander, assault and battery, malicious prosecution, trespass, etc., and could not have intended [Civil Code section 3294] to be applied to a products liability case arising out of a design defect in a mass produced automobile because neither strict products liability nor mass produced automobiles were known [when the law was enacted] in 1872." (*Id.* at p. 809.) The court rejected this narrow view of the purpose of the punitive damages statute. The court stated: "To paraphrase *Li v. Yellow Cab Co.* [(1975)] 13 Cal.3d 804, [822][119 Cal.Rptr. 858, 532 P.2d 1226], the applicable rules of construction 'permit if not require that [Civil Code] section [3294] be interpreted so as to give dynamic expression to the fundamental precepts which it summarizes.' " (*Id.* at p. 810.) "Governmental safety standards and the criminal law have failed to provide adequate consumer protection against the manufacture and distribution of defective products. [Citations.] Punitive damages thus remain as the most effective remedy for consumer protection against defectively designed mass produced articles." (*Ibid.*) Thus, the goal of punitive damages came to be seen largely as actual deterrence of a broad course of conduct through sanctions imposed in individual litigation.

### 3. *How to Punish and Deter: California's Broad View*

In addition to its broad view of the goal of punitive damages, the *Grimshaw* court also adopted the broad view of the measure of punitive damages: "Unlike malicious conduct directed toward a single specific individual, Ford's tortious conduct endangered the lives of thousands of Pinto purchasers. Weighed against the factor of reprehensibility, the punitive damage award . . . was not excessive." (*Grimshaw, supra*, 119 Cal.App.3d at pp. 819–820.) Further, the *Grimshaw* court stated: "An award which is so small that it can be simply written off as a part of the cost of doing business would have no deterrent effect. An award which affects the company's pricing of its product and thereby affects its competitive advantage would serve as a deterrent." (*Id.* at p. 820.)[2] (In *Grimshaw* itself there was no issue of the maximum amount of punitive damages that could be awarded: the punitive damage award by the trial court was 1.4 times the compensatory damages. (119 Cal.App.3d at pp. 820, 822–823.))

In keeping with familiar rules of stare decisis, we applied the broad standards for punitive damages established by California case law in our original opinion in this case. To be sure, such standards were subject to

---

[2] We also note the Legislature seems to have shared this broad view of punitive damages. In enacting restrictions on the timing of presentation of punitive damages evidence to the jury in 1979, the Legislature viewed the scope of such evidence to include the "profits the defendant has gained by virtue of the wrongful course of conduct of the nature and type shown by the evidence." (Civ. Code, § 3295, subd. (a)(1).)

limitations or "guideposts" established in *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559 [134 L.Ed.2d 809, 116 S.Ct. 1589]. But, as evidenced in our original opinion, we applied these guideposts in light of the broad purposes and broad measure of punitive damages, in which courts undertook to *actually* deter a practice or course of conduct by depriving the wrongdoer of profit from the course of conduct or making such conduct so expensive it put the wrongdoer at a competitive disadvantage. (See *Grimshaw, supra,* 119 Cal.App.3d at p. 820.) "Punishment and deterrence" in this view is far along a scale that might be viewed as increasing from mere admonition toward direct incapacitation.

### 4. *Punishment and Deterrence in State Farm: The Narrow View Reasserted*

*State Farm,* in our view, impliedly disapproved this broad view of the goal and measure of punitive damages. Instead, as a matter of due process under the federal Constitution, the court adopted the more limited, historically based view of punitive damages. (See *Private Wrongs, supra,* 87 Minn. L.Rev., at pp. 667–673 [Although this law review article preceded *State Farm* by a month, much of its approach to the issues is quite prescient.].) In doing so, the court in *State Farm* went beyond the "guideposts" established in *Gore* and articulated a constitutional due process limitation on both the goal and the measure of punitive damages. Further, the result is a punitive damages analysis that focuses primarily on what defendant did to the present plaintiff, rather than the defendant's wealth or general incorrigibility. (See *State Farm, supra,* 538 U.S. at p. 423.)

### 5. *What Is to Be Punished, Revisited*

Thus, the *State Farm* court first limited the goal that the states are permitted to reach through punitive damages: "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . ." (*State Farm, supra,* 538 U.S. at p. 423.) "Punishment on the [basis that harm is minor to the individual but massive in the aggregate] creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains." (*Ibid.*) "While States enjoy considerable discretion in deducing when punitive damages are warranted, each award must comport with the principles set forth in *Gore.* Here the argument that State Farm will be punished in only the rare case, coupled with reference to its assets . . . had little to do with the actual harm sustained by the Campbells." (*Id.* at p. 427.) ▇ As we read *State Farm,* then, the legitimate state goal that punitive damages may seek to

achieve is the "condemnation of such conduct" as has resulted in "outrage and humiliation" to the plaintiffs before the court (*ibid.*); it is not a permissible goal to punish a defendant for everything else it may have done wrong.[3]

### 6. How to Punish and Deter, Revisited

In addition to limiting the goal to be reached through punitive damages, the court's rejection of the broad view of punitive damages—as established in California by *Grimshaw*—also must result in a reconsideration of the standard of constitutional excessiveness by which punitive damages are constrained. As we demonstrated in our prior opinion in this case, the broad view of punitive damages fully supported the $290 million punitive damages award in the present case. That massive award, however, was justified only as a means to actually punish and deter an entire course of conduct that harmed not only plaintiffs but, potentially, untold others. In *State Farm*, the court made it clear that the permissible punishment is for the harm inflicted on the present plaintiffs. "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." (*State Farm, supra,* 538 U.S. at p. 423; see also *id.* at pp. 424–426.) Deterrence, in this view, arises as a natural result of imposing damages over and above traditional compensatory damages, not from the imposition of sanctions in an individual case that are actually disabling to the defendant.[4]

---

[3] This is not to say that evidence of similar conduct is not relevant and admissible. Whether civilly or criminally, a state is permitted to punish recidivist conduct more severely than an individual instance of malfeasance. (*State Farm, supra,* 538 U.S. at p. 423.) However, "in the context of civil actions courts must ensure the conduct in question replicates the prior transgressions." (*Ibid.*)

[4] In limiting the basis for punitive damages to the conduct that harmed the plaintiff, the court reasserted the historical rationale for the requirement that punitive damages bear a reasonable relationship to compensatory damages. (*State Farm, supra,* 538 U.S. at p. 423.) The limitation long has been criticized as irrational by scholars who assumed the legitimacy of the broad view of the goal and measure of punitive damages. In their view, it should make no difference whether there was one person or six in the Romos' Bronco, and it should make no difference whether the crushed roof killed people or, by fluke, resulted only in minor injuries: the size of a punitive damages award sufficient to punish and deter—that is, to actually dissuade the defendant from the same design and testing practices in the future—is the same regardless of the compensatory damages awarded to any particular victim of the defendant's course of conduct. (See Ellis, *Fairness and Efficiency in the Law of Punitive Damages* (1982) 56 So.Cal. L.Rev. 1, 58–60.) In this view, punitive damages are to be measured on the basis that they must fill a void in which "[g]overnmental safety standards and the criminal law have failed to provide adequate consumer protection against the manufacture and distribution of defective products." (*Grimshaw, supra,* 119 Cal.App.3d at p. 810.) A "reasonable relationship" requirement, in this view, makes no sense. However, if the goal of punitive damages is not to disable the defendant from continuing the course of conduct, but instead to punish defendant for the outrage committed against the plaintiff, as the court emphasized in *State Farm*, then reference to a "reasonable relationship" between compensatory and punitive damages clearly is logical.

The issue for the *State Farm* court, by contrast with the *Grimshaw* view (for example), is not whether a particular punitive damages award is sufficient actually and in fact to dissuade the course of conduct but, instead, whether such award punishes and deters to an extent found sufficient historically. (*State Farm, supra,* 538 U.S. at p. 425.) Accordingly, the court used as a guide to the proper level of punishment and deterrence the "long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." (*Ibid.*) The court found that these multipliers "demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the state's goals of deterrence and retribution . . . ." (*Ibid.*) When considered in light of products liability actions against large corporate defendants for which single-digit multipliers may simply be a cost of doing business (see *Grimshaw, supra,* 119 Cal.App.3d at p. 820), the court's conclusion is far from "obvious." However, in the light of the historical goal and measure of punitive damages, the obviousness appears, to a certain extent.[5]

### 7. *Which Single Digit Sufficiently Punishes and Deters?*

Although the need to limit most punitive damages awards to a single-digit multiplier was obvious to the Supreme Court, there was not a *particular* single digit that appeared appropriate in all cases, according to the court. (*State Farm, supra,* 538 U.S. at p. 425.) ■ By restating the guidelines articulated in *Gore,* the *State Farm* opinion recognized that even within the limited punitive and deterrent functions of punitive damages, there are malicious and outrageous acts that deserve a harsher sanction than other acts, even though the latter are also malicious or outrageous. The *State Farm* opinion did, it seems to us, explain the *Gore* factors in a way that was not apparent in *Gore* itself. We will discuss *State Farm's* amplification of the three *Gore* factors before we turn to the application of the factors in the present case.

The court reiterated that reprehensibility of the defendant's conduct is the most important consideration in determining the reasonableness of a punitive damages award. (*State Farm, supra,* 538 U.S. at p. 419.) As discussed above, however, the court newly emphasized that the conduct directed toward the plaintiff was the focus of this inquiry. Conduct that is widespread or has other victims can enhance reprehensibility in somewhat the same manner recidivism enhances the seriousness of criminal

---

[5] See, e.g., *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1056 [135 Cal.Rptr.2d 736] ("Doing our best to understand the proportionality requirements of the due process clause, as revealed by the [*State Farm*] court, we conclude the $5.5 million punitive damages award does not comport with due process").

conduct. Unlike criminal recidivism, however, in which prior dissimilar conduct can transform a relatively minor current felony into a crime punishable by life in prison (see Pen. Code, § 667, subds. (b)–(i)), "in the context of civil actions courts must ensure the conduct in question replicates the prior transgressions." (*State Farm, supra,* 538 U.S. at p. 423.) Further, as previously discussed, in the case of widespread malicious conduct that causes relatively minor individualized injury, the basic level of reprehensibility is not increased through repetition. "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis." (*Ibid.*)

■ In its treatment of the second *Gore* factor, the reasonable relationship requirement, the *State Farm* court gave this additional guidance: While a higher single-digit multiplier might be appropriate where noneconomic harm is difficult to detect or to value under traditional compensatory damages standards, the "converse is also true . . . . When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." (*State Farm, supra,* 538 U.S. at p. 425.) Further, the court instructed that we must look at the *nature* of the compensatory damages award, with the result that a lower multiplier will be appropriate if the compensatory damages award for the particular tort already compensates for the "outrage and humiliation" that punitive damages are primarily intended to condemn. (*Id.* at p. 426.)

*State Farm*'s treatment of the third *Gore* factor fundamentally altered that factor, it appears to us. *Gore* had implied that greater punitive damages would be reasonable if the state imposed severe civil and criminal penalties for similar conduct. (See *Gore, supra,* 517 U.S. at pp. 575, 583.) In *State Farm,* by contrast, the court discounted the fact that malicious conduct might fit within the definition of serious criminal conduct as defined by state law: "Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." (*State Farm, supra,* 538 U.S. at p. 428.) The existence of a criminal penalty fits better within the reprehensibility guidepost as having "bearing on the seriousness with which a State views the wrongful action." (*Ibid.*) Logically, this bearing extends to giving the tortfeasor notice of the seriousness of the offensive conduct. However, "[g]reat care must be taken to avoid use of the civil process to assess criminal penalties." (*Ibid.*)

## C. *The Jury Instructions in This Case in Light of State Farm*

Now that we have set forth our understanding of *State Farm*, we come to the task of applying that opinion as part of our independent review of the punitive damages award. (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 431–433 [149 L.Ed.2d 674, 121 S.Ct. 1678].)

■ First, we conclude *State Farm*'s constitutionalization of the historical, pre-*Grimshaw* punitive damages doctrines as part of federal due process means that the jury was fundamentally misinstructed concerning the *amount* of punitive damages it could award in the present case.[6] In particular, under BAJI No. 14.71, the jury in this case was instructed that, in addition to other factors, it should consider in arriving at an award of punitive damages "[t]he amount of punitive damages which will have a deterrent effect on the defendant in the light of defendant's financial condition." As we have discussed above, this view of "actual" deterrence, while clearly supported by California law under *Grimshaw*, fails to restrict the jury to punishment and deterrence based solely on the harm to the plaintiffs, as apparently required by federal due process. (See *State Farm, supra,* 538 U.S. at pp. 422–424.)[7]

Other portions of the instruction required that the jury find malice "in the conduct on which you base your finding of liability." This requirement established a threshold for the imposition of punitive damages, but it did not restrict the amount of the award. Accordingly, plaintiffs' counsel argued that the award should be large enough to force Ford to recall all remaining 1978–1979 Broncos still on the road and "crush them to dust." Counsel

---

[6] We reject defendant's attempt to revive its jury misconduct claims on the basis that *State Farm*'s "exacting appellate review" of punitive damages requires the application of different and more liberal standards to determine that misconduct is prejudicial to a defendant against whom punitive damages have been awarded. *State Farm* did not involve in any way the jury's determination that the defendant had engaged in malicious conduct that subjected it to punitive damages in *some* amount. After reviewing the trial court findings, apparently pursuant to a substantial evidence standard, the Supreme Court stated: "While we do not suggest there was error in awarding punitive damages based upon State Farm's conduct toward the Campbells, a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives . . . ." (*State Farm, supra,* 538 U.S. at pp. 419–420.)

[7] As implied at footnote 3, *ante*, this focus upon punishing defendant solely for the outrage inflicted upon the present plaintiffs is not an evidentiary limitation. Plaintiffs are still entitled to show similar conduct on the issue of reprehensibility. The point here is that the instructions must not invite the jury to impose damages sufficient to punish and deter all conduct by defendant of the *type* directed toward these plaintiffs. Similarly, evidence concerning defendant's financial condition is not unlawful or inappropriate under *State Farm*. Defendant's wealth, however, must be used by the jury only to determine the appropriate punishment for the present malicious conduct, not as a gauge for the imposition of a penalty that will actually deter the entire type or course of conduct that affected these plaintiffs. (See *State Farm, supra,* 538 U.S. at p. 426.)

argued that $1 billion was the appropriate award, based on the profit Ford made on all 1978–1979 Broncos, factored to reflect Ford's use of that money over the next 20 years. Finally, counsel requested $1 billion so that the resulting publicity would reach all remaining owners of this model Bronco so they would know how dangerous the vehicle was. These considerations are impermissible under *State Farm* and plaintiffs' argument served to magnify the impact of the misinstruction.

■ While the underlying facts supporting a punitive damages award are for the jury to decide, the amount of punitive damages must be independently reviewed on appeal. (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* 532 U.S. at pp. 436–437.) In conducting such review, we remove any prejudice accruing to the defendant as a result of misinstruction concerning the amount of such award; we do so by modifying the judgment to reflect a level of punitive damages below which we believe no properly instructed jury was reasonably likely to go. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Accordingly, our reduction of the award satisfies the due process interests of defendant.

While we determine that punitive damages in the reduced amount are not constitutionally excessive, we also note that our review of the factors informing the punitive damages award undoubtedly results in an award somewhere near the top of the permissible range, subject to certain anomalies particular to the present case. (See fns. 12 & 13 and accompanying text, *post.*) Our resolution of this case, permitting plaintiffs to consent to a reduction of damages to a level below which a properly instructed jury would not likely go, satisfies the due process and appellate rights of the plaintiffs.

D.  *Constitutional Excessiveness in Light of State Farm*

As we concluded in our original opinion in this case, the independent review to which a defendant is constitutionally entitled goes solely to the issue of excessiveness of the punitive damages award (see also *Diamond Woodworks, Inc. v. Argonaut Ins. Co., supra,* 109 Cal.App.4th at pp. 1050–1051); factual issues are resolved under traditional standards of substantial evidence review (see *id.* at p. 1056) and our previous conclusions concerning the jury findings in this case were unaffected by *State Farm.*[8]

---

[8] We reject defendant's contention that *State Farm* requires this court either to reevaluate the evidence or to accept only "the core facts of the case that the jury *had to find* in order to return a punitive damage verdict against the defendant." Nothing in *State Farm* supports such a remarkable deviation from traditional substantial evidence review of the jury's factual determinations, uniformly applied in cases from simple civil appeals to the exacting appellate review of judgments imposing the death penalty, as well as in punitive damages cases. (See *Roberts v. Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 801–802 [274 Cal.Rptr.

### 1. *Reprehensibility*

■ Substantial evidence supports the jury's implicit conclusion that Ford acted with malicious conduct under aggravated circumstances; such a set of facts propels this situation toward the higher end of the reprehensibility scale. (See *Romo, supra,* 99 Cal.App.4th at p. 1148.) As stated in our original opinion, not only did Ford "willfully and consciously ignore[] the dangers to human life inherent in the 1978 Bronco as designed, resulting in the deaths of three persons" (*ibid.*), it also ignored its own internal safety standards, created a false appearance of the presence of an integral roll-bar, and declined to test the strength of the roof before placing it in production. (*Ibid.*) The same conduct (see *State Farm, supra,* 538 U.S. at pp. 423–424; see fn. 3, *ante,* at p. 750) that resulted in the death of three of plaintiffs' family members also put at risk all who drove or rode in this model Bronco.

Defendant's conduct was highly reprehensible under *Gore* based on the following: defendant caused a high degree of physical harm, including deathly harm, to the victims of the instant accident; the nonaccidental, malicious conduct in placing the defective 1978–1979 model Ford Bronco with consumers, including these victims, while not intentionally causing the present deaths and injuries, reflected, in a nonisolated manner, a reckless disregard of consumers' safety and lives; and the victims were financially vulnerable relative to defendant's financial resources.

While we do not preclude the possibility that other conduct, such as intentionally causing death or serious physical injury, might be more reprehensible, the present conduct was extremely reprehensible for conduct occurring in a products liability context. The reprehensibility factor (see *Gore, supra,* 517 U.S. at pp. 575–577) weighs heavily in favor of substantial punitive damages.

### 2. *The Relationship Between Compensatory and Punitive Damages*

Because of the nature of the causes of action in the present case and the jury's peculiar allocation of compensatory damages, application of the second *Gore* factor (see *State Farm, supra,* 538 U.S. at p. 427) is rather complex. Nevertheless, it is possible on the present record to reach certain conclusions about the relationship between compensatory damages

---

139] [applying substantial evidence test to affirm malice determination].) In *State Farm,* the court independently considered the relevance and materiality of certain evidence (e.g., concerning dissimilar in-state conduct), but it did not purport to reweigh the evidence to find that such conduct did not occur or was not malicious. (See, e.g., *State Farm, supra,* 538 U.S. at pp. 422–425.)

and a reasonable award of punitive damages. The following detailed exposition of the compensatory damages award provides the foundation.

### a. *The Plaintiffs as Individuals, Heirs, and Personal Representative*

The plaintiffs in this case sought damages in three different capacities. As administrator of the estates of his deceased family members, Juan Romo sought damages pursuant to Code of Civil Procedure section 377.34 (hereafter section 377.34) for "loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and [not including] damages for pain, suffering, or disfigurement." Next, as individuals suffering personal injury, all three plaintiffs sought economic and noneconomic damages arising from their own physical and emotional injuries in the accident. Finally, as heirs of the deceased persons, the three plaintiffs sought wrongful death damages pursuant to Code of Civil Procedure section 377.61, which permits an award of such damages "that, under all the circumstances of the case, may be just, but [not including] damages recoverable under Section 377.34."

### b. *The Instructions Concerning Plaintiffs' Differing Capacities*

The jury instructions were not totally clear about the three different capacities.[9] The jury was instructed with the series of instructions, BAJI Nos. 14.00 through 14.13, concerning compensation of each "plaintiff for all loss or harm, provided that you find it was or will be suffered by the plaintiff and was caused by the defendant's conduct." (BAJI No. 14.00, as given.) The instruction was not modified to distinguish between the individual plaintiffs and Juan Ramon Romo as a representative plaintiff, nor to reflect that the estates were plaintiffs for purposes of the section 377.34 actions.

Next, the jury was instructed with BAJI No. 14.50, concerning damages to the three individual plaintiffs as "the heirs of Ramon, Salustia, and Ramiro Romo, deceased." This instruction informed the jury that "you may consider the financial support, if any, which each of said heirs would have received from the deceased except for such death, and the right to receive support, if any, which each of said heirs has lost by reason of such death. You also may consider the costs of obtaining substitute domestic services. This is economic damage." The jury was instructed that it could not consider "pain and suffering of a decedent."

---

[9] As with our prior discussion of instructional problems, we are not here reviewing these instructions for reversible instructional error. Indeed, the compensatory damages are not at issue in this appeal. Rather, this discussion assists the establishment of the proper framework for our analysis of the relationship between compensatory and punitive damages.

Finally, the jury was instructed it must award "an amount that will compensate for whatever reasonable expense was paid out or incurred for funeral services in memory of a decedent and for burial of the bodies . . . . This is economic damage." (In the written version of the instructions, this portion is included at the end of BAJI No. 14.50 and one would infer that the award would compensate *the heirs* for the funeral expenses.)

Absent from the instructions was any specific reference to the damages to be awarded to the estates of the deceased persons or to Juan Ramon Romo as administrator of those estates.

### c. *The Confused Categorization of Damages in the Verdict*

The verdict form, after questions concerning liability issues, included the following directions concerning the amount of damages: "[W]hat do you find to be the total amount of damages, including economic and non-economic damages, if any, suffered by the plaintiffs and caused by either the defective 1978 Ford Bronco or the negligence of the defendant Ford Motor Company? [¶] Answer as to each plaintiff as designated below." The form continued as set out below. Numbers have been inserted to reflect the jury's entries before modification by the court; the numbers in italics reflect the awards as modified by the court to reflect the comparative negligence adjustments and the judgment notwithstanding the verdict reductions.

| "Estate of Ramon Romo: | Economic Damages | $183,988 | *[$5000]* |
| "Estate of Salustia Romo: | Economic Damages | $295,645 | *[$5000]* |
| "Estate of Ramiro Romo: | Economic Damages | $0 | |

"Juan Romo (Personal Injuries):

| (a) Economic Damages | | $727,314 | *[$654,582.60]* |
| (b) Non-Economic Damages | | $2,000,000 | *[$1,560,000]* |
| | TOTAL | $2,727,314 | *[$2,214,582.60]* |

"Evangelina Romo (Personal Injuries):

| (a) Economic Damages | | $2097 | *[$2097]* |
| (b) Non-Economic Damages | | $1,500,000 | *[$1,170,000]* |
| | TOTAL | $1,502,097 | *[1,172,097]* |

"Maria Romo (Personal Injuries):

| (a) Economic Damages | | $3357 | *[$3357]* |
| (b) Non-Economic Damages | | $1,500,000 | *[1,170,000]* |
| | TOTAL | $1,503,357 | *[$1,173,357]* |

"Wrongful Death of Ramon Romo
(All Heirs):

| | | | |
|---|---|---|---|
| (a) Economic Damages | | $5522 | [*][10] |
| (b) Non-Economic Damages | | $0 | [*] |
| | TOTAL | $5522 | [*] |

"Wrongful Death of Salustia Romo
(All Heirs):

| | | | |
|---|---|---|---|
| (a) Economic Damages | | $4830 | [*] |
| (b) Non-Economic Damages | | $0 | [*] |
| | TOTAL | $4830 | [*] |

"Wrongful Death of Ramiro Romo
(All Heirs):

| | | | |
|---|---|---|---|
| (a) Economic Damages | | $4040 | [*] |
| (b) Non-Economic Damages | | $0 | [*] |
| | TOTAL | $4040 | [*]" |

In addition, the jury found that defendant had "committed malice in the conduct upon which [the jury] base[d] [its] finding of liability." The jury filled in the following sentence, as indicated: "We assess exemplary and punitive damages against Ford Motor Company as follows: [¶] Amount: $290,000,000."

The jury allocated 78 percent of fault to defendant, 12 percent to the driver who swerved in front of the Romos, and 10 percent to Juan Ramon Romo. The court reduced certain of the damages awarded, in accordance with this allocation of fault.

### d. *The Postverdict Motions.*

Defendant moved for a new trial or judgment notwithstanding the verdict on the basis, among others, that the award to the estates of Ramon and Salustia Romo was not supported by the evidence, in light of the limitations

---

[10] Neither the judgment nor the order resolving the new trial motion addressed the "all heirs" awards. Presumably, in the context of this multimillion-dollar judgment the parties simply overlooked these items, totaling less than $15,000. Because these items clearly would be addressed in any retrial of the punitive damages issues, we include the awards in our consideration of the reasonable relationship between compensatory and punitive damages.

on these damages under section 377.34.[11] The trial court conditionally granted the new trial motion, permitting plaintiffs to avoid a new trial by accepting a reduction of compensatory damages to $5,000 for each estate. Plaintiffs accepted the reduction.

### e. *Analysis of the Verdict*

The verdict and the court's modification of it obviously reflect some confusion on the part of the jury concerning the categorization of the award of damages to plaintiffs in their different capacities. For present purposes, however, we can glean with sufficient clarity what the jury intended to do, and can use that result to determine the constitutional limits of the punitive damages award.

First, the award made by the jury for economic damages to the "estates" should have been entered as economic damages to "all heirs" on the "Wrongful Death" lines of the verdict form. Those figures most likely reflect the loss of financial support and the value of lost household services through the 18th birthday of the youngest of the Romo survivors, Maria. (The jury was specifically instructed to award damages for loss of financial support and value of household services as *economic* damages; none of the other economic damages entries is large enough to constitute an award consistent with the evidence, yet proof of such loss was clear.) The figures entered for economic damages on the "Wrongful Death" lines in the verdict as rendered most likely reflect funeral and burial expenses.

Second, the large awards for noneconomic damages awarded to the surviving children likely contained some component for loss of "love, companionship, comfort, affection, society, solace or moral support" as a result of the death of their parents and brother, when the award of noneconomic damages is compared to the figures suggested for this particular loss by plaintiffs' counsel in argument to the jury. This component of damages was properly awarded to the children in their capacity *as heirs*, as the jury was instructed in BAJI No. 14.50. The jury apparently awarded it separately to each individual plaintiff, instead of awarding a lump sum on the line for noneconomic damages for "All Heirs"; it awarded zero on that line. It is, of course, impossible to determine the exact segment of the children's noneconomic damages award attributable to their emotional distress claims, their pain and suffering claims, and their heirship claims, not only because the

---

[11] Section 377.34 states: "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."

verdict form does not break out those segments, but also because the segments are not distinct in definition and logic: they address overlapping elements of loss.

Third, the larger award of noneconomic damages to Juan, who was most seriously injured, seems to indicate that the premodification $1.5 million noneconomic damages award to Maria and Evangelina arose largely from their loss of family members, rather than for physical pain and suffering. In turn, this indicates a substantial portion of Juan's initial award up to $1.5 million is likely based on loss of his family members, rather than his physical pain and suffering.

### f. *The "Reasonable Relationship" Factor*

These conclusions concerning the jury's compensatory damages award obviously are not precise enough to support reformation of the verdict through grant of judgment notwithstanding the verdict, or otherwise. Nor is the matter of reformation of the compensatory award breakdown before us. Nevertheless, our conclusions provide a framework in which we can consider the issue of constitutional excessiveness of the punitive damages award for purposes of both permitting plaintiffs to avoid a retrial and protecting the due process rights of defendant.

There are two points to be made based on these conclusions, one of major importance and one of lesser importance. First, no one would deny that a *decedent* has lost something valuable when he or she loses life. Yet there was no award whatsoever in the original verdict—and no possibility of such an award under the instructions—reflecting the "outrage" to the deceased family members themselves, occasioned by their loss of the opportunity for the personal satisfactions, large and small, that make life worth living.[12]

Such loss to the decedent is not a proper subject of compensatory damages for the estate or the heirs. Plaintiffs as individuals and as heirs of the deceased family members were adequately compensated for their losses, as such losses are recognized by statute and in our common law tradition. The decedents were *not*—and *could not be*—adequately compensated for the loss of their lives.

Compensation, however, is not the issue. Punitive damages are not intended to compensate; instead they are intended to punish and make an

---

[12] The deceased family members "would have been entitled to recover [punitive damages] had [they] lived" (§ 377.34), just as the surviving family members were entitled to such damages. Although the *right* to such damages arises from the same statutory source for both deceased and surviving victims, the *amount* of such damages must, in order to serve the purposes articulated by section 3294, be measured somewhat differently and, in the case of the deceased victims, take into account the impact of death upon the decedent and the loss of decedent's opportunity to live.

example of the defendant as a result of defendant's malicious conduct. (Civ. Code, § 3294, subd. (a).) In this context of malicious conduct, as opposed to ordinary negligence actions, public policy and legitimate interests of the state in the protection of its people require a mechanism to punish and deter conduct that kills people. It would be unacceptable public policy to establish a system in which it is less expensive for a defendant's malicious conduct to kill rather than injure a victim. (Cf. *Grimshaw, supra,* 119 Cal.App.3d at p. 833.) Thus, the state has an extremely strong interest in being able to impose sufficiently high punitive damages in malicious-conduct wrongful death actions to deter a "cheaper to kill them" mindset, while still maintaining limits on wrongful death compensation in cases of ordinary negligence. We do not perceive that due process considerations of proportionality between compensatory and punitive damages require a state to establish a system that inadequately punishes and deters malicious conduct that, with reasonable foreseeability, may cause death; we hold that death actions present an example of the type of extraordinary case contemplated by *State Farm* (see *State Farm, supra,* 538 U.S. at p. 425) in which a single-digit multiplier does not necessarily form an appropriate limitation upon a punitive damages award.

█ This is not to say that all standards are thrown out in cases brought by personal representatives of the estates of deceased victims. Even among instances of malicious conduct that causes death, some of such conduct will be more or less reprehensible than other instances. We conclude, however, that the proportionality factor has less weight in the context of malicious conduct causing death. Given the unique nature of the compensatory damages arising under section 377.34, the proportionality inquiry must focus, in any event, on the relationship of punitive damages to the harm to the deceased victim, not merely to compensatory damages awarded. (See *Romo v. Ford Motor Co., supra,* 99 Cal.App.4th at p. 1147.)

Further, the legal standard for the award of compensatory damages in section 377.34 actions ensures that there is no "punitive" component in the compensatory damages award in such actions; as a result there is no danger of duplicative damages in a punitive damages award under section 377.34, as there was in the context of the emotional distress compensatory award in *State Farm.* (See *State Farm, supra,* 538 U.S. at p. 426.) Finally, in the rather unique circumstances of the present case, because Ramiro Romo's estate was awarded no compensatory damages, defendant is not punished in any way whatsoever for depriving Ramiro of his life. Thus, as a result of this cumulative undercompensation, a higher ratio between

compensatory and punitive damages may be justified with respect to Juan Ramon Romo as administrator of the estates of his mother and father. (*Ibid.*)[13]

■ By contrast, in the case of the individual plaintiffs' personal injury claims, a large portion of the compensatory damages award was for noneconomic damages. Because some component of this award, particularly as related to plaintiffs' emotional distress claims, likely involved considerations similar to the punitive damages award, a somewhat lesser multiplier is appropriate as to those damages. (See *State Farm, supra,* 538 U.S. at p. 426.)

The second, less important point arising from our review of the jury's verdict is that loss of financial support and the value of household services were legitimate items of compensable economic loss for the heirs, and because of the jury's mistake in placing that award on the wrong line, the compensatory damages award for the plaintiffs was about $470,000 less than the jury most likely intended. This undercompensation of actual loss supports a higher ratio between the trial-court-modified compensatory damages and punitive damages on plaintiffs' individual and heirship claims. (*State Farm, supra,* 538 U.S. at p. 425.)

### 3. *Comparable Civil and Criminal Punishments*

We turn to the third *Gore* factor, disparity between criminal and civil penalties for similar conduct and the size of the award in the present case. (*State Farm, supra,* 538 U.S. at p. 428.) Willful and conscious disregard of danger resulting in loss of life can constitute involuntary manslaughter. (*Romo, supra,* 99 Cal.App.4th at p. 1148.) By the same token, the failure of prosecutors to seek criminal convictions in cases of the present sort does not permit an enhancement of the punitive damages award in a civil case. (*State Farm, supra,* 538 U.S. at p. 428.)

---

[13] We need not revisit in the present case the state law requirement that punitive damages to an estate are available only where (at least nominal) compensatory damages have been awarded (see generally *Cheung v. Daley* (1995) 35 Cal.App.4th 1673, 1676–1677 [42 Cal.Rptr.2d 164]; but see *Carr v. Progressive Casualty Ins. Co.* (1984) 152 Cal.App.3d 881, 892 [199 Cal.Rptr. 835] [actual injury, even if uncompensated, is sufficient to support punitive damages]), since the dignity interests of all three family members are adequately addressed by the overall measure of punitive damages to be awarded to the estates. Even though we believe the award to the estates of Ramiro's parents in some general sense addresses the dignity interest of all three deceased family members, the total award should not be taken as a substitute for a direct award of punitive damages to the estate of Ramiro Romo in the event of retrial. If, in any retrial of the amount of punitive damages, a properly instructed jury concluded Ramiro suffered compensable injury, it would be entitled to award separate punitive damages to his estate.

We conclude the third *Gore* factor requires neither a higher nor lower ratio between the compensatory and punitive damages award.

### 4. *Conclusion: The Point at Which "the State's Legitimate Objectives" Are Satisfied*

██ Our independent review in this case convinces us that the extreme reprehensibility of defendant's actions and the undercompensation of plaintiffs' individual losses outweigh the punitive element already contained to some extent in the individual compensatory damages awards. As a result, we consider that a punitive damages award of triple the compensatory award to the individual plaintiffs would be constitutionally reasonable. An award of three times the compensatory damages of $4,574,429, or a total of $13,723,287, to the individual plaintiffs jointly, is not more than a properly instructed jury likely would award and would not be constitutionally unreasonable.[14]

Considerations of reprehensibility and the nature of damages in section 377.34 actions, as well as the public policy consideration that malicious conduct resulting in death should not be encouraged by making it less expensive for a defendant to kill than to injure, all lead us to conclude that an award of punitive damages to the estate of each deceased parent of $5 million is constitutionally reasonable. An award of punitive damages to Juan Romo as administrator of the estates in the total amount of $10 million is not more than a properly instructed jury likely would award and would not be constitutionally unreasonable.

For reasons described above, we do not believe that the deathly harm component of the punitive award in the present case is strictly constrained by the single-digit multiplier set forth in *State Farm*. Nevertheless, we note the overall punitive damages award we find appropriate after independent review, $23,723,287, is approximately five times the total compensatory damages awarded in this case.

## III.  DISPOSITION

In the event plaintiffs elect to remit all of the punitive damages judgment save and except for the total sum of $23,723,287, the punitive damages judgment shall be modified and affirmed in that amount. In the event

---

[14] We arrive at this figure by adding the compensatory damages awards as modified by the court, then adding back in those sums, reasonably supported by the evidence, that were awarded by the jury but omitted from the final award through inadvertence or because the jury entered the award on the wrong line, circumstances that would be rectified in any retrial of the amount of punitive damages.

plaintiffs decline remittitur, the punitive damages judgment is reversed and the matter is remanded for a new trial on the amount of punitive damages only. The parties shall bear their own costs on appeal.

Buckley, J., and Cornell, J., concurred.

A petition for a rehearing was denied December 15, 2003.