[No. D036615. Fourth Dist., Div. One. June 25, 2001.]

MARCELINO OREGEL, Plaintiff and Respondent, v.
AMERICAN ISUZU MOTORS, INC., Defendant and Appellant.

COUNSEL

Bacalski, Byrne & Koska and Christopher J. Workman for Defendant and Appellant.

Law Offices of Michael E. Lindsey and Michael E. Lindsey for Plaintiff and Respondent.

## OPINION

**McDONALD, J.**—Respondent Marcelino Oregel leased a new 1998 Isuzu Rodeo (the car) manufactured by appellant American Isuzu Motors, Inc. (Isuzu). Approximately one year later Oregel demanded, pursuant to the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq., hereafter the Act), that Isuzu repurchase the car, claiming it had a chronic oil leak that Isuzu was unable to fix. Isuzu declined to repurchase the car and Oregel filed this lawsuit alleging Isuzu willfully violated its obligations under the Act. The jury found in favor of Oregel. Isuzu argues the jury's verdict is not supported by substantial evidence.

I

### FACTUAL AND PROCEDURAL BACKGROUND

A. *The Facts*

Oregel leased the car in late March 1998 from the Ron Baker Chevrolet Isuzu dealership (Ron Baker). It was Oregel's practice to have all maintenance, including oil changes, performed by Ron Baker. Oregel had Ron Baker change the car's oil every 3,000 miles. The car was serviced in June 1998 and September 1998; the invoices for these services do not include a request to check for an oil leak.[1]

In October 1998 Oregel received a letter from his homeowners association complaining that there was an oil spill on the driveway where he parked the car and asking him to clean the oil from the driveway. He removed the oil, and the following day took the car to Ron Baker and asked the service department to check for an oil leak. Ron Baker retightened the EGR valve adapter and "add[ed] dye to check for other possible leaks." During the next two weeks, Oregel drove the car about 800 miles and then returned it to Ron Baker. The invoice for that visit reflected that the purpose of the visit was to check for an oil leak; Ron Baker concluded a faulty gasket was the cause and replaced the gasket.

Approximately five weeks later, the car was again leaking oil; Oregel returned to Ron Baker for an oil change and also asked that the oil leak be

---

[1]Although Oregel testified he asked Ron Baker to check for an oil leak during his September 1998 visit, he acknowledged that he had no recollection of either the June 1998 or September 1998 service visits independent from the information contained on the invoices.

fixed. The invoice for that December 17, 1998, visit reflects "parts on order," but does not identify what (if anything) Ron Baker did to repair the oil leak. However, Ron Baker told Oregel the oil leak had been fixed.

On January 2, 1999, Oregel returned to Ron Baker for another oil change. He also reported that oil was still leaking. The oil was changed and again Oregel was told the oil leak was fixed. However, the car continued leaking oil onto Oregel's driveway and garage floor, and his coworkers noticed and commented on the oil spots where Oregel parked the car at his place of employment. On January 12, 1999, Oregel returned to Ron Baker and complained about the continuing oil leak, and also complained that the gas gauge was malfunctioning. Ron Baker kept the car for two days, and Oregel was told the leak had been fixed. The invoice for that visit stated "engine failure" under the notation concerning the oil leak.[2] When Oregel returned the car to Ron Baker around January 28, 1999, to have the gas gauge part installed, he was told Ron Baker inspected the car and no oil leak was found.

One month later, Oregel again returned the car to Ron Baker and complained the car was continuing to leak oil and asked Ron Baker to fix the leak. The invoice from that February 25, 1999 visit, reflecting Oregel's request that Ron Baker again fix the oil leak, stated that "oil from filter gets [caught] in crossmember" but does not identify what Ron Baker did to attempt to repair the oil leak. However, Oregel was told the oil leak was fixed.

The car continued to leak oil despite Ron Baker's efforts to locate and fix the problem.[3] Oregel began taking photographs documenting the oil stains on his driveway, in his garage and at work.[4] He did not return to Ron Baker or any other Isuzu dealer after his visit on February 25, 1999. Because he was concerned about the safety and reliability of the car, Oregel bought a different vehicle in mid-April 1999. Thereafter, he did not drive the car and instead kept it in his garage.

Oregel initially contacted Isuzu in mid-January about the problems with the car. He explained the chronic oil leaking problem and asked that the car be replaced. Isuzu told Oregel that it was awaiting the results of the dye test

---

[2] Ron Baker also ordered a replacement part for the gas gauge during this visit.

[3] Oregel testified that Ron Baker would try to fix the leak, but after Oregel drove the car a "certain amount of miles, it start[ed] leaking again," and estimated he drove it for about 500 miles after the repairs before the leak would reappear.

[4] A photograph taken on February 28, 1999, depicted a significant amount of oil that accumulated over a three-day period. A photograph taken on March 6, 1999, depicted a significant amount of oil accumulated on the ground over a 24-hour period. Similar photographs depicted significant amounts of oil accumulating over varying periods of time.

that would be checked when he returned the car for the gas gauge replacement. However, in a subsequent January 1999 conversation, Isuzu told Oregel that there was a pan under the motor that collected oil and that it would drop some oil for about two weeks after it was cleaned but that it should stop after that two-week period. However, the leaking did not stop. On February 25, 1999, Oregel again called Isuzu to report the continued leaking, and Isuzu advised him to take the car back to a dealer for inspection and repair. Oregel then turned the matter over to an attorney. Oregel's attorney wrote to Isuzu revoking acceptance of the car and demanded that Isuzu agree to repurchase it. After Isuzu informed Oregel's attorney that the matter had been referred to its regional office for investigation, Oregel filed the present lawsuit.

Mr. Reynolds, an expert employed by Isuzu to investigate warranty claims involving Isuzu vehicles, examined and tested the car and testified the only oil leakage came from a loose oil pan drain plug bolt.[5] He also testified the loose drain plug was attributable to improper maintenance and was therefore not covered under the warranty. However, he could not explain how Ron Baker's mechanics, on the six different occasions they searched for the source of an oil leak, could have missed finding such an obvious source of leakage as a loose drain plug, and conceded it was not likely that well-trained mechanics would repeatedly overlook that obvious explanation for oil leakage.

B. *The Lawsuit*

Oregel's complaint alleged a claim against Isuzu under the Act. The liability issues were bifurcated from the damage issue. In the liability phase, the jury found the car's oil leak was a nonconformity that substantially impaired the use, value or safety of the car and that Isuzu was unable to fix the leak after a reasonable number of attempts. The jury also found Isuzu willfully violated its obligation to repurchase the car under the Act and should pay a civil penalty to Oregel equal to the amount of the damage award. In the damages phase, the court awarded $11,131.82 as damages,

---

[5]Reynolds's opinion that the oil leak was attributable to an improperly tightened oil plug was based on his observations and test results. He explained that he saw evidence of leakage only around the oil drain plug. He then tested his hypothesis by reinstalling the bolt with a new washer and tightening it to manufacturer specifications, adding oil and dye, cleaning the engine compartment and undercarriage, and running the engine for 30 to 45 minutes. There was no sign of leakage at the end of this test. He then returned the car to Oregel with instructions to drive it for two weeks. When Reynolds examined it two weeks later, he found no oil leakage.

plus a civil penalty of $11,131.82, plus interest, and entered judgment in accordance with the verdict and damage award.[6]

## C. *Contentions on Appeal*

Isuzu argues there is insufficient evidence to support the essential elements of Oregel's case. Isuzu claims there was no evidence the car contained or developed a nonconformity covered by the express warranty because the oil leak was a problem caused by improper maintenance; maintenance problems are not covered by the express warranty. Isuzu also argues there was no evidence that Isuzu was unable to repair the nonconformity after a reasonable number of attempts. Isuzu finally argues there is no evidence to support the civil penalty.

## II

## ANALYSIS

## A. *Standard of Review*

When findings of fact are challenged in a civil appeal, we are bound by the familiar principle that "the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) We view the evidence most favorably to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].) Substantial evidence is evidence of ponderable legal significance, reasonable, credible and of solid value. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].) However, "[s]ubstantial evidence . . . is not synonymous with 'any' evidence." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871 [269 Cal.Rptr. 647].) Instead, the evidence must be " 'substantial' proof of the essentials which the law requires." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].)

The focus is on the quality, rather than the quantity, of the evidence. "Very little solid evidence may be 'substantial,' while a lot of extremely

---

[6]Isuzu moved for judgment notwithstanding the verdict or for a new trial on the ground that the verdict was not supported by the evidence. Although the court did not timely rule on those motions, resulting in a denial of the motions by operation of law (Code Civ. Proc., § 660), it apparently did hear and consider those motions after the statutory deadline and issued an order denying the motions.

weak evidence might be 'insubstantial.' " (*Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra*, 220 Cal.App.3d at pp. 871-872.) Inferences may constitute substantial evidence as long as they are the product of logic and reason rather than speculation or conjecture. (*Louis & Diederich, Inc. v. Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1584-1585 [234 Cal.Rptr. 889].) The testimony of a single witness can provide substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

### B. *The Act*

A plaintiff pursuing an action under the Act has the burden to prove that (1) the vehicle had a nonconformity covered by the express warranty that substantially impaired the use, value or safety of the vehicle (the nonconformity element); (2) the vehicle was presented to an authorized representative of the manufacturer of the vehicle for repair (the presentation element); and (3) the manufacturer or his representative did not repair the nonconformity after a reasonable number of repair attempts (the failure to repair element). (Civ. Code, § 1793.2; *Ibrahim v. Ford Motor Co.* (1989) 214 Cal.App.3d 878, 886-887 [263 Cal.Rptr. 64].)

### C. *There Is Substantial Evidence the Car Had a Nonconformity Covered by the Express Warranty*

The evidence supports the jury's conclusion that the car developed a persistent oil leak, and Isuzu does not dispute that a new car that persistently leaks a significant amount of oil despite proper maintenance does not conform to Isuzu's express warranty. ■ However, Isuzu notes the express warranty excludes any defects or failures caused by "improper adjustments [or] improper maintenance," and argues there is no evidence to support the jury's conclusion that the leaking oil was caused by a warrantied defect rather than improper maintenance. Isuzu argues the nonconformity element is not supported by any evidence because Oregel produced no evidence the *cause* of leaking oil was something other than the loose drain plug, and Isuzu's expert opined the loose drain plug and resulting leakage were attributable to improper maintenance.[7]

We are not persuaded by Isuzu's argument. First, there was some evidence to support a conclusion that the oil leak was attributable to a source other

---

[7]Isuzu also argues that because the nonconformity element is absent the presentation element is necessarily absent; without a nonconformity it is impossible to show the car was presented for repair of the nonconformity.

than the loose drain plug; Reynolds conceded it was unlikely Ron Baker's mechanics would have repeatedly overlooked a loose drain plug as a source of the leak. Reynold's testimony would permit a jury to conclude the mechanics did replace the gasket and tighten the drain plug but despite this procedure oil continued to leak, raising an inference the leak was attributable to some other cause.[8] Additionally, in the last visit in which Ron Baker checked for oil leaks, the mechanic reported on the repair order that "oil from filter gets [caught] in crossmember," from which a jury could infer that the leak was attributable to an inability to create a seal between the engine and the oil filter.[9]

Second, even if the oil leak emanated from the loose drain plug, there is evidence from which a jury could infer that the car suffered from a nonconformity covered by the express warranty. The evidence showed Oregel took the car for oil servicing to Ron Baker, whose mechanics had expertise in performing the steps required when changing the oil in the car. The Isuzu manual specified that, as the penultimate step for an oil change, the drain plug be reinstalled with a new gasket and be properly tightened. The invoices for the oil change services reflect Ron Baker did install a new gasket on each occasion, and presumably tightened the plug to manufacturer specifications. However, Oregel testified that after a few hundred miles of leak-free operation the oil leak reappeared (see fn. 3, *ante*). This evidence, coupled with Reynolds's observation that it was unlikely the mechanics would have overlooked the need to check for a tightened drain plug, permits a jury to infer that when the car was driven for a short period of time some

---

[8]Isuzu also argues it was incumbent on Oregel to prove not only that the car leaked oil but also to show the cause of the leak, and that he failed to meet this burden because he produced no expert testimony proving the cause of the leak. However, the statute requires only that Oregel prove the car did not conform to the express warranty, and proof that there was a persistent leak that Ron Baker could not locate or repair suffices. We do not interpret the statute as depriving a consumer of a remedy if he cannot do what the manufacturer, with its presumably greater expertise, was incapable of doing, i.e. identify the source of the leak. We also reject Isuzu's claim that Oregel was obliged to introduce expert testimony to prove the nonconformity. It is within the realm of common knowledge that a new car with an unremediable oil leak does not conform to its warranty, and no expert testimony is necessary to establish this proposition. (*Jorgensen v. Beach 'n' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 163 [177 Cal.Rptr. 882] ["The correct rule on the necessity of expert testimony has been summarized by Bob Dylan: 'You don't need a weatherman to know which way the wind blows.' " (Fn. omitted.)].)

[9]Isuzu seeks to discount this evidence by citing the testimony of a Ron Baker manager that oil can drip onto the crossmember when the filter is removed. However, Ron Baker's manager did not testify that the mechanic reported oil on the crossmember only after removing the filter, and thus this evidence does not exclude the inference that oil was located on the crossmember before the filter was removed.

defect or anomaly in the car permitted a properly tightened drain plug to slowly loosen, causing oil to leak.[10]

D. *There Is Substantial Evidence Isuzu Did Not Repair the Car After a Reasonable Number of Attempts*

■ Isuzu concedes that four failed repair attempts for the same problem is a reasonable number of attempts. Isuzu nevertheless argues there is no evidence that Ron Baker attempted on four occasions to fix the car's oil leak. Although Oregel presented the car to Ron Baker to fix the leak on six occasions, there was only one attempt to repair the leak: the visit at which the head gasket was replaced. Isuzu argues the other visits do not qualify as repair attempts because Ron Baker merely looked for the source of the leak during those remaining visits.[11]

The Act is a remedial measure intended for the protection of consumers and should be given a construction consistent with that purpose. (*Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139, 1158 [67 Cal.Rptr.2d 543, 82 A.L.R.5th 781], disapproved on other grounds by *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 775, fn. 6 [98 Cal.Rptr.2d 1, 3 P.3d 286].) We believe, as did the court in *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294 [45 Cal.Rptr.2d 10], that the only affirmative step the Act imposes on consumers is to "permit[] the manufacturer a reasonable *opportunity* to repair the vehicle." (*Id.* at pp. 302-303, italics added.) Whether or not the manufacturer's agents choose to take advantage of the opportunity, or are unable despite that opportunity to isolate and make an effort to repair the problem, are matters for which the consumer

---

[10]This inference would be entirely consistent with the results of Reynolds's test. Reynolds reinstalled the drain plug with a new gasket, tightened it to manufacturer specifications, added oil and dye, and ran the engine for 30 to 45 minutes; this test produced no sign of leakage. When Reynolds examined the car two weeks later, he found no oil leakage, *but the car had not been driven during that period.* Because Oregel did not drive the car during the two-week period after Reynolds retightened the drain plug, and Oregel had earlier testified that the oil leak would temporarily abate after Ron Baker's mechanics fixed the car but would then reemerge after the car was driven around 500 miles, the jury could have concluded that Reynolds's test was not inconsistent with oil leakage from an oil drain plug that was tightened by a mechanic during a service visit but that would not retain its tightened position after a few hundred miles of driving.

[11]Ms. LaCalle, Isuzu's customer relations manager for the western region with responsibility for evaluating requests for repurchase under the Act, testified that Isuzu treats a visit as a qualified repair attempt only when a part is taken off, replaced or adjusted, and if the mechanic is unable to diagnose the problem there is no repair attempt. She explained that a customer could go to the dealer an unlimited number of times complaining of a problem, but that if the dealer could not find the source and therefore made no replacements or adjustments, there would be no repair attempts triggering Isuzu's repurchase obligations.

is not responsible.[12] There was sufficient evidence to support the conclusion Oregel satisfied the presentation element by, on six different occasions, bringing the car in and requesting that Ron Baker repair the oil leak.

### E. *There Is Substantial Evidence to Support the Civil Penalty*

■ Isuzu finally argues there is no evidence that it willfully violated its obligations under the Act to repair the car or refund the purchase price. Whether a manufacturer willfully violated its obligation to repair the car or refund the purchase price is a factual question for the jury that will not be disturbed on appeal if supported by substantial evidence. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 134-136 [41 Cal.Rptr.2d 295].) The proper standard, as explained by the court in *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 185 [28 Cal.Rptr.2d 371] is that: "a violation is not willful if the defendant's failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present. This might be the case, for example, if the manufacturer reasonably believed the product *did* conform to the warranty, or a reasonable number of repair attempts had not been made, or the buyer desired further repair rather than replacement or refund. ¶ Our interpretation of section 1794(c) is consistent with the general policy against imposing forfeitures or penalties against parties for their good faith, reasonable actions. Unlike a standard requiring the plaintiff to prove the defendant *actually knew* of its obligation to refund or replace, which would allow manufacturers to escape the penalty by deliberately remaining ignorant of the facts, the interpretation we espouse will not vitiate the intended deterrent effect of the penalty. And unlike a simple equation of willfulness with volition, which would render 'willful' virtually all cases of refusal to replace or refund, our interpretation preserves the Act's distinction between willful and nonwillful violations." (Original italics.)

The jury was properly instructed on this standard. Because the evidence supports the determination Isuzu had the obligation to repurchase the car, we consider only whether there is evidence to support the jury's conclusion that Isuzu's refusal to repurchase did not result from a good faith and reasonable belief the car did not have an unrepairable defect covered by the warranty or that a reasonable number of attempts had not been made to effect a repair.

There is evidence Isuzu was aware that numerous efforts to find and fix the oil leak had been unsuccessful, which is evidence a jury may consider on

---

[12]Courts in other jurisdictions have agreed with our approach. In *Chmill v. Friendly Ford-Mercury* (1988) 144 Wis.2d 796 [424 N.W.2d 747], the court construed a statute similar to the Act and concluded that presenting the vehicle to the manufacturer for repair qualified as a repair attempt even though the manufacturer was unable to locate the source of the problem and therefore did not actually perform any repair of the vehicle.

the question of willfulness. (*Jensen v. BMW of North America, Inc., supra,* 35 Cal.App.4th at p. 136.) Additionally, the jury could conclude that Isuzu's policy, which requires a part be replaced or adjusted before Isuzu deems it a repair attempt but excludes from repair attempts any visit during which a mechanic searches for but is unable to locate the source of the problem (see fn. 11, *ante*), is unreasonable and not a good faith effort to honor its statutory obligations to repurchase defective cars. (Cf. *Kwan v. Mercedes-Benz of North America, Inc., supra,* 23 Cal.App.4th at p. 185 ["manufacturers [cannot] escape the penalty by deliberately remaining ignorant of the facts"].) Finally, there was evidence that Isuzu adopted internal policies that erected hidden obstacles to the ability of an unwary consumer to obtain redress under the Act.[13] This latter evidence would permit a jury to infer that Isuzu impedes and resists efforts by a consumer to force Isuzu to repurchase a defective car, regardless of the presence of an unrepairable defect, and that Isuzu's decision to reject Oregel's demand was made pursuant to Isuzu's policies rather than to its good faith and reasonable belief the car did not have an unrepairable defect covered by the warranty or that a reasonable number of attempts to effect a repair had not yet occurred.

### DISPOSITION

The judgment is affirmed. Oregel is entitled to costs on appeal.

Kremer, P. J., and Nares, J., concurred.

---

[13]The owner's manual given to purchasers of Isuzu's cars states a consumer must, if he wishes to preserve his rights under state "Lemon Laws," notify Isuzu if the dealer has been unable to repair problems but specifies the notice may be either in writing *or* by calling a toll-free number listed in the warranty book. However, Isuzu's internal policy memorandum instructs Isuzu personnel that they are to begin an investigation of a reported problem only after receiving *written* notification from the consumer.