[Nos. F040188, F040529. Fifth Dist. Dec. 23, 2005.]

GREG JOHNSON et al., Plaintiffs and Respondents, v.
FORD MOTOR COMPANY, Defendant and Appellant.

## Counsel

McCormick, Barstow, Sheppard, Wayte & Carruth, D. Greg Durbin; Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Sonja R. West, Courtney A. Cook and William E. Thompson for Defendant and Appellant.

William M. Krieg & Associates, William M. Krieg and Kimberly L. Mayhew for Plaintiffs and Respondents.

Chavez & Gertler, Mark A. Chavez and Kathryn C. Palamountain for Consumers for Auto Reliability and Safety as Amicus Curiae on behalf of Plaintiffs and Respondents.

Pillsbury & Levinson, Arnold R. Levinson and Terrence J. Coleman for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

**VARTABEDIAN, Acting P. J.—**

## I.

### Introduction

In our previous, unpublished opinion in this case, filed November 25, 2003, we held that the $10 million punitive damages verdict against defendant Ford Motor Company was based on an impermissible theory of recovery and was, in addition, constitutionally excessive. We concluded the maximum constitutionally permissible punitive damages award was $53,435, or three times the compensatory damages ($17,811.60) awarded by the jury.

Plaintiffs Greg and Jo Ann Johnson petitioned for review by the Supreme Court. The court granted the petition. Although the court agreed with our conclusions that the punitive damages award was based on an impermissible theory and that the verdict was constitutionally excessive, the court reversed the judgment of this court and remanded the matter "for a new determination of the maximum constitutional award" of punitive damages in accordance with a "correct understanding of the law" as expressed in the Supreme Court's decision. (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1213 [29 Cal.Rptr.3d 401] (*Johnson*).)

## II.

### Facts and Procedural History

A. *The Plaintiffs' Transaction*

The facts were thoroughly summarized in the Supreme Court's opinion:

"In February 1998, plaintiffs Greg and Jo Ann Johnson bought a used 1997 Ford Taurus from a car dealer, Decker Ford (Decker), for $17,411. When Greg Johnson asked about the previous ownership, the salesman told them only that the Taurus had been traded in for a newer model. When he asked to see the Taurus's repair history, he was shown a computer printout that indicated there had been no significant repairs. The jury found Decker had acted as Ford's agent in this sales transaction.

"In fact, the previous drivers, the McGills, had experienced repeated and seemingly unrepairable difficulty with the car's transmission after leasing it in late 1996. After at least four trips to the dealership for the transmission

problems, one transmission replacement, and an incident in which the transmission locked in low gear on the freeway, the McGills, in July 1997, requested that Ford repurchase the car as a 'lemon.'

"Ford's district customer service manager reviewed Decker's records and decided the automobile did not qualify for mandatory repurchase under California's lemon law (Civ. Code, §§ 1790–1795.7). (The jury later found to the contrary.) Instead, she approved issuance of an 'owner appreciation certificate' worth $1,500 on any trade-in at Decker. Though the McGills were never told they had received an owner appreciation certificate from Ford, Decker applied the $1,500 credit to their trade of the Taurus for a new pickup truck, then recovered the $1,500 from Ford.

"After Decker resold the Taurus to plaintiffs, they also experienced transmission problems with it. When, in August 1998, Greg Johnson complained that it delayed in shifting and 'slammed' into gear, Decker replaced the transmission. In March 1999, the transmission would not shift into reverse; Decker again replaced it. At that point, in discussion with Decker's service writer, Greg Johnson asked to see and was finally shown the car's complete repair file, thus learning of the McGills' earlier problems.

"The Johnsons sued Ford and Decker for intentional and negligent misrepresentation and concealment, violations of the Song-Beverly Consumer Warranty Act (Civ. Code, §§ 1790–1795.7) (Lemon Law), the Consumer Legal Remedies Act (Civ. Code, §§ 1750–1784), the unfair competition law (Bus. & Prof. Code, §§ 17200–17210), and the prohibition on false or misleading advertising (Bus. & Prof. Code, § 17500). Plaintiffs settled with Decker prior to trial and, after the jury verdict, voluntarily dismissed their unfair competition and false advertising causes of action against Ford." (*Johnson, supra,* 35 Cal.4th at pp. 1197–1198, fn. omitted.)

B. *Ford's "Owner Appreciation Certificate" Program*

Plaintiffs presented evidence concerning the scope and profitability of defendant's owner appreciation certificate (OAC) program in California, as well as evidence concerning the program in the context of California's lemon law, Civil Code sections 1790–1795.7. (All further section references are to this code unless otherwise indicated.) The Supreme Court's opinion thoroughly summarized this evidence as well:

". . . Ford's stated policy was that OAC's—credits of up to $5,000 on trade-ins for new Ford vehicles provided as goodwill to help 'satisfy the customer and to restore the customer's confidence in Ford products'—were to be issued only for vehicles that did not meet the state's definition of a lemon

and therefore were not subject to mandatory reacquisition. But plaintiffs introduced evidence that, in evaluating eligibility, at least some Ford managers employed a narrow concept of what constituted a repair attempt for purposes of applying state lemon laws, including California's, under which a vehicle that cannot be repaired in a 'reasonable number' of attempts must be reacquired or replaced. (See § 1793.2, subd. (d)(2).) Specifically, the regional customer service manager who handled the McGills' complaint and authorized issuance of the OAC testified she interpreted the Ford training and policy materials to provide that an occasion on which the customer brought the vehicle in with a complaint, but the service staff was unable to find or confirm the problem, was not counted as a repair attempt. Ford's former policy manager for the reacquired vehicle program similarly stated that '[i]f the technician does not replace a part or make an adjustment to the vehicle, and it's properly documented as no problem found, then I would not count it as a repair.'[1]

"In addition, Ford's reacquired vehicle program looked almost exclusively to whether a vehicle met the law's *presumption* of reasonable repair attempts, based on a specified number of attempts in a certain period (see § 1793.22, subd. (b)), rather than whether the number of attempts was itself reasonable regardless of the presumption (see § 1793.2, subd. (d)(2)). Thus, the 1998 reacquired vehicle program manual repeatedly instructed customer service managers that vehicles meeting 'state lemon law presumption[s]' were not eligible for an OAC, stated that a used car would be eligible for an OAC if it 'does not meet lemon law presumption,' and gave as examples of ineligible vehicles those with more repair attempts or days out of service than specified under a state's lemon law presumption. In line with these written policies, the regional customer service manager testified she understood an OAC could not be offered 'if the vehicle met the presumption of lemon law,' and the former policy manager explained that 'we don't determine anything by reasonable repair attempts because we cannot define reasonable repair attempts.' By these narrow constructions, Ford allowed itself to issue OAC's for dealer trade-in of vehicles that arguably should have been reacquired as lemons, thereby avoiding the title branding and additional notice requirements involved in reselling a lemon. (See § 1793.23, subd. (c).)

"Ford managers also testified that the company regarded OAC's as assistance to the customer, not the dealership. Ford thereby avoided the requirement of California law to notify future buyers of defects that led to a vehicle's reacquisition by the manufacturer or the dealer with manufacturer

---

[1] At this point, the Supreme Court's footnote 2 states: "Ford's narrow understanding of a repair attempt has been rejected by an appellate court in a Lemon Law case against another manufacturer. (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1103–1104 [109 Cal.Rptr.2d 583].)" (*Johnson, supra,* 35 Cal.4th at p. 1198.)

assistance 'in response to a request by the buyer or lessee that the vehicle be either replaced or accepted for restitution because the vehicle did not conform to express warranties,' a requirement that applies even if the vehicle is not reacquired as a lemon. (§ 1793.23, subd. (d) [in such cases, the manufacturer must give the subsequent buyer the 'warranty buyback notice' prescribed in § 1793.24].) The reacquired vehicle policy manual specified that while OAC's were ordinarily mailed to the dealer, in California they were to be sent instead to the customer (though, as noted earlier, no certificate was in fact mailed to the McGills). According to the former policy manager, the policy of mailing to the customer was adopted '[t]o avoid anyone getting the impression we're trying to assist a dealer.'

"Plaintiffs presented further evidence that Ford's San Francisco and Los Angeles offices issued about 1,200 to 1,400 OAC's per year in the year of trial and the previous year (2000 and 2001). The average face amount of OAC's issued over the four previous years was between $2,700 and $3,200. Finally, testimony was given to the effect that the cost of reacquiring a vehicle as a lemon (i.e., the cost of repurchasing or replacing the vehicle less its resale or salvage value) was between $8,500 and $13,500, depending on the year and the method of reacquisition (refund or replacement)." (*Johnson, supra*, 35 Cal.4th at pp. 1198–1199.)

The jury awarded plaintiffs $17,811.60 in compensatory damages and punitive damages of $10 million.[2] The Supreme Court summarized our disposition of defendant's appeal: "The Court of Appeal found substantial evidence not only that Ford had fraudulently concealed material facts from the Johnsons by failing to provide them the warranty buyback notice required under section 1793.24, but also that punitive damages against the corporation were justified because 'defendant's entire customer response program was structured precisely to short-circuit lemon law claims whenever defendant plausibly could,' by restrictively interpreting state lemon laws and ignoring the possibility of nonpresumptive lemons." (*Johnson, supra*, 35 Cal.4th at p. 1200.) In conducting our de novo review of the punitive damages for constitutional excessiveness, however, we modified the $10 million judgment, concluding that punitive damages of $53,435 (three times the compensatory damages) was the maximum award permitted under the due process clause of the federal Constitution.

The Supreme Court granted plaintiffs' petition for review, reversed our judgment, and remanded the matter with instructions, described further in the discussion section, *post*.

---

[2] The trial court additionally awarded $379,348 in attorney fees on plaintiffs' statutory causes of action.

### III.

### Discussion

■ As discussed both in this court's previous opinion and in *Johnson*, the United States Supreme Court has held that "grossly excessive or arbitrary" punitive damages awards violate a defendant's right to due process under the Fourteenth Amendment. (See *State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–417 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*).) The high court has mandated that appellate courts, state and federal, engage in "exacting" de novo review of punitive damages awards and make "an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct." (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 [29 Cal.Rptr.3d 379] (*Simon*).) These three considerations have become known as the "*BMW* guideposts," after the Supreme Court decision first announced them in *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559 [1134 L.Ed.2d 809, 16 S.Ct. 1589] (*BMW*), or the "*State Farm/BMW* guideposts" because the high court further refined the guideposts in *State Farm, supra,* 538 U.S. 408. (See, e.g., *Simon, supra,* at p. 1183.)

In reviewing this court's previous opinion, the Supreme Court recognized that we discussed the three *State Farm/BMW* guideposts, but it concluded that we "gave no express *weight*" to the "scale and profitability" of defendant's scheme to defraud consumers, when we applied the first (reprehensibility) guidepost. (*Johnson, supra,* 35 Cal.4th at p. 1213.) In addition, the court concluded that our "discussion of the remaining two *State Farm/BMW* guideposts [did not] explain the drastic reduction ordered" in the punitive damages judgment. (*Ibid.*) Finally, the court deemed that we had applied a standard of due process review "that is blind to the state's interest in punishing and deterring a wrongful corporate practice." (*Ibid.*) Since the Supreme Court could not "be sure the lower court made its decision under a correct understanding of the law, a remand for a new determination of the maximum constitutional award is appropriate." (*Ibid.*)

We have received supplemental briefing from the parties and now address the issues designated by the Supreme Court. We have also received an amicus curiae brief in support of plaintiffs filed on behalf of United Policyholders.

### A. *The State's Interest in Punishment and Deterrence*

■ On the same date we filed our unpublished opinion in the present case, we filed an opinion for publication in a separate case that raised related

punitive damages issues, *Romo v. Ford Motor Co.* (2003) 113 Cal.App.4th 738 [6 Cal.Rptr.3d 793]. Our earlier opinion in the present case made reference to *Romo*'s extended discussion of punitive damages as a vindication of the state's interest in punishment and deterrence. In *Romo*, we sought to reconcile *State Farm*'s insistence that a punitive damages award bear a reasonable relationship to the harm to individual plaintiffs and what we perceived to have been a broader focus of California punitive damages law that permitted the award of punitive damages to reflect (more or less directly) the harm to all persons affected by the defendant's course of conduct. (See *id.* at pp. 745–751.) Our conclusion was that due process required that the state's interest in punishing and deterring oppressive, fraudulent, or malicious conduct (see § 3294) be vindicated through the punitive damages imposed for the harm to the individual plaintiffs, not through an award based upon similar harm to other residents of California as well—that is, based upon the entire course of oppressive, fraudulent, or malicious conduct that gave rise to the individual plaintiffs' injury. (See *Romo v. Ford Motor Co., supra,* 113 Cal.App.4th at p. 751.)

This court's opinion did make it clear, however, that evidence of an entire course of conduct was "relevant and admissible" on the issue of the *State Farm/BMW* reprehensibility guidepost because "a state is permitted to punish recidivist conduct more severely than an individual instance of malfeasance." (*Romo v. Ford Motor Co., supra,* 113 Cal.App.4th at p. 750, fn. 3.)[3] When we applied the reprehensibility guidepost in *Romo*, we concluded Ford's conduct was "extremely reprehensible," in part, because it "put at risk all who drove or rode in this model Bronco." (*Id.* at p. 755.)

In our earlier opinion in the present case, the sole basis cited for our conclusion that defendant's conduct was "highly reprehensible" was that defendant's conduct in the present case reflected a formal policy that was designed to obtain in as many cases as possible the same wrongful result obtained in the present case. (*Johnson v. Ford Motor Co.* (Nov. 25, 2003, F040188 & F040529) [nonpub opn.].) The scope and scale of the potential harm in this case was the basis for gauging the state's interest in punishment and deterrence through punitive damages.

Accordingly, neither in *Romo* nor in the present case were we "blind to the state's interest in punishing and deterring a wrongful corporate practice" (*Johnson, supra,* 35 Cal.4th at p. 1213) or course of conduct. Rather, those

---

[3] "Recidivist conduct" incompletely expresses the basis for imposition of greater penalties in some instances, because it might be thought to imply a prior determination that the conduct in question is impermissible. Instead, greater punishment is appropriate for *repeated* conduct: as the scope and scale of, for example, a fraudulent practice increases, the state has a greater interest in punishment and deterrence of the practice.

opinions merely sought, albeit unconvincingly (*id.* at p. 1206), to give a historical rationale for *State Farm*'s due process rule, aptly summarized by our Supreme Court in *Johnson*, as follows: "The scale and profitability of a course of wrongful conduct by the defendant cannot justify an award that is grossly excessive in relation to the harm done or threatened [*to the present plaintiffs*], but scale and profitability nevertheless remain relevant to reprehensibility and hence to the size of award warranted, under the guideposts, to meet the state's interest in deterrence." (*Id.* at p. 1207.)

When we consider that defendant is a major participant in a highly regulated industry in California, and that its formal policies were designed to circumvent one important part of that regulation, we reiterate that defendant's conduct was highly reprehensible and the state has a very strong interest in deterrence of similar conduct.

B.   *The Weight of "Scope and Profitability" in Determining Reprehensibility*

As discussed, *ante*, our earlier opinion in this case expressly recognized that because defendant's treatment of plaintiffs occurred pursuant to a formal policy designed to circumvent the lemon law, that conduct was "highly reprehensible." (*Johnson v. Ford Motor Co., supra*, F040188.) In our discussion of defendant's claim of insufficient evidence of corporate misconduct, we noted the "compelling evidence" that supported "an inference that the present transaction [with plaintiffs] was typical of owner appreciation certificate transactions, which numbered over 1,000 per year, and that the use of such certificates was intended, as a matter of policy, to short-circuit lemon law claims." (*Ibid.*) We summarized the evidence supporting this inference. This evidence and the inference therefrom, in turn, formed the basis for our conclusion of high reprehensibility.

In reversing the judgment in this case, the Supreme Court expressed concern that we "may have given insufficient, if any, weight to the scale and profitability of Ford's fraudulent conduct." (*Johnson, supra*, 35 Cal.4th at p. 1213.) There was, however, no evidence of the scale and profitability of the practice beyond the summary stated, *ante*. As the Supreme Court recognized earlier in its opinion, plaintiffs' proof of the scope and profitability of the fraudulent practices "suffers from several major deficiencies." (*Id.* at pp. 1210–1211.) As to scope, plaintiffs "offered no proof that all OAC transactions . . . involved defective vehicles subject to California's Lemon Law." (*Id.* at p. 1211.) The evidence in the current record would show the scope of the fraudulent practices (as opposed to the overall scope of the OAC program) only if we "assume the customer is always right in such disputes,

an assumption we cannot make." (*Ibid.*) As to profitability, plaintiffs' proof showed that defendant saved $6,000 to $10,000 per vehicle if it used the OAC program to avoid repurchase of a vehicle that was actually a lemon. But plaintiffs "introduced no evidence as to how many unrepaired, defective OAC trade-ins fell into this category" of actual lemons. (*Ibid.*) And while OAC vehicles might sell for more if their complaint/repair history were not disclosed (as it was not in plaintiffs' case), plaintiffs "did not show that California Ford dealers always, or generally, conceal and lie about the repair history of used cars they sell." (*Id.* at p. 1212.)[4]

Accordingly, on the present record we believe the most we can say about the scope and profitability of fraudulent activity under the OAC program is that substantial evidence supported inferences that (1) the program was structured the way it was precisely to short-circuit the lemon law; (2) the fraudulent transaction with plaintiffs was a "typical" use of the OAC program, to use the description used by defendant's witness; and (3) when used in this fraudulent manner, the OAC program was highly profitable, saving defendant up to $10,000 per use. The evidence, as the Supreme Court noted, does not permit us to gauge the *actual*, as opposed to potential, fraud that occurred through the OAC program nor the actual, as opposed to potential, savings to defendant generated by similar fraudulent transactions. However, the design and implementation by a very large national corporation of a company-wide program that permitted and encouraged efforts to circumvent the lemon law in California demonstrates sufficient potential for great harm to the buying public to conclude plaintiffs established a high degree of reprehensibility.

On the other hand, the proof in this case does not establish an extraordinary degree of reprehensibility. Reprehensibility, of course, is a matter of

---

[4] As the Supreme Court explained in more detail: "We do not mean to suggest Ford's fraud on plaintiffs was unique. Ford's reacquired vehicle manual stated that the principal use for OAC's was to 'satisfy customers . . . who have lost confidence in a repaired vehicle.' A large number of OAC's therefore probably involved vehicles with serious defects. When taken in conjunction with the evidence that Ford maintained its OAC's did not assist dealers to reacquire vehicles and interpreted other Lemon Law requirements narrowly, this stated use supports an inference that in some number of cases in addition to plaintiffs' own, perhaps a large number of other cases, OAC's were used to evade Lemon Law requirements, and sales of OAC-traded vehicles were made without the proper historical disclosures, resulting in significant savings to Ford. In some subset of those cases, a dealer may also have concealed and lied about the vehicle's history, preventing the new buyer from learning the truth. But one cannot infer that this fraudulent practice occurred in *all* cases of OAC-traded vehicles. As plaintiffs' estimate of Ford's savings on each OAC transaction depends on assumptions that each such transaction was for a vehicle that should have been reacquired as a lemon and thus should have carried with it a statutory notice, and that each subsequent buyer of an OAC-traded vehicle was defrauded, predicates plaintiffs failed to prove, *their attempt to estimate aggregate profits from fraudulent transactions similar to theirs also fails.*" (*Johnson, supra,* 35 Cal.4th at p. 1212, fn. omitted, second set of italics added.)

degree and, as suggested, *ante*, if most or all OAC transactions had been shown to have involved fraud by defendant, that sheer consistency of intent might well have established an extraordinary level of reprehensibility. (See *State Farm, supra,* 538 U.S. at p. 419.) The present record, however, does not permit a finding of extraordinary reprehensibility.

We conclude, weighing the relevant factors to determine the degree of reprehensibility (see *Simon, supra,* 35 Cal.4th at pp. 1180–1181), reprehensibility as established in the record before us weighs in favor of a substantial award of punitive damages. The level of reprehensibility established by plaintiffs' proof is not, however, so overwhelming as to support punitive damages anywhere near the $10 million awarded by the jury. We conclude that the level of reprehensibility shown by the evidence in this case is not a "special justification" (*id.* at p. 1182) that provides a constitutional basis for an award substantially in excess of the single-digit range. (See *id.* at pp. 1182, 1189.)[5]

### C.  *Comparable Civil Penalties*

The third *State Farm/BMW* guidepost (we will further address the second guidepost, *post*) requires us to examine "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm, supra,* 538 U.S. at p. 418.)

■ As we stated in our earlier opinion in this case, the Song-Beverly Consumer Warranty Act is the most comparable statutory regulation of the kind of conduct involved in this case. Song-Beverly provides for a civil penalty equal to twice the compensatory damages award when the defendant has committed a "willful" violation of the act. Here, however, the jury found, in essence, that defendant *intentionally* concealed information with the *intent* to defraud plaintiffs. Thus, on the one hand, the statutory scheme does not (with its double damages penalty) "tend to support the present award of [$10 million] in punitive damages, a sum [560] times the financial harm defendant's fraud caused plaintiff." (*Simon, supra,* 35 Cal.4th at p. 1184 [in *Simon* the bracketed amounts were $1.7 million and 340 times the compensatory damages, respectively].) On the other hand, the present intentional conduct (based, as it was, on formal company-wide practices and policies) was

---

[5] We reject the argument of amicus curiae that the permissible range for punitive damages discussed in *State Farm* should have little application in California. Amicus curiae argues that punitive damages are available in other states based solely on negligent conduct. California's much higher statutory threshold, requiring oppression, fraud, or malice proved by clear and convincing evidence (§ 3294, subd. (a)), in this view, essentially constitutes "special justification" that routinely permits punitive damages awards substantially in excess of the single-digit range. We believe, however, that this approach to *State Farm* is untenable in light of *Simon.*

significantly more egregious than the minimum "willful" conduct sufficient to support a Song-Beverly civil penalty. Accordingly, in our view, the comparison with Song-Beverly does not begin to justify the $10 million punitive damages award, but neither does Song-Beverly represent a legislative determination that punitive damages for the intentional conduct before us must be limited to the lower end of the ordinary range of such damages.

### D. Ratio of Punitive Damages to Actual or Potential Harm

In the present case, as pointed out in Justice Baxter's dissent in *Johnson*, the punitive damages award of $10 million was based on an impermissible theory and does not establish a valid level at which the state's interest in punishment and deterrence would be vindicated in the absence of federal due process "excessiveness" considerations. (See *Johnson*, *supra*, 35 Cal.4th at p. 1217 (conc. & dis. opn. of Baxter, J.).) Nevertheless, the majority states that this court's earlier opinion fails to "explain the drastic reduction ordered" (*id.* at p. 1213), implying that the $10 million award merited consideration in some manner in the course of our de novo review.

Accordingly, we take the jury's original verdict not as an exact expression of the level of damages necessary to punish and deter but, still, as an expression of the jury's conclusion that a very large award was necessary to punish and deter in light of the injury to plaintiffs, the scope and formal nature of defendant's scheme, and defendant's size and wealth. We conclude that the jury, instructed that the award was to bear a reasonable relationship to the compensatory damages award, determined it would require a very large punitive damages award to punish and deter this defendant.[6]

When we consider the second *State Farm/BMW* guidepost, the requirement that a punitive damages award not be unreasonable in relation to the harm or potential harm to the plaintiff, the starting point is necessarily the compensatory damages award. (See *Simon*, *supra*, 35 Cal.4th at pp. 1173–1174.) In this case, as in *Simon*, the compensatory award adequately addressed plaintiffs' entire injury. Thus, the compensatory award "did accurately measure the injury proven to have been inflicted. . . . This was not a case where the harm could not be quantified and only nominal damages were awarded." (*Id.* at p. 1189.) On the other hand, the compensatory award was for economic damages and contained no punitive element. (*Ibid.*) Accordingly, the size of the compensatory award is a neutral factor; that is, it provides an actual and concrete point for "calibration" of the maximum permissible punitive damages award. (See *Simon, supra,* 35 Cal.4th at p. 1188.)

---

[6] In our de novo review, the usefulness of the amount of the jury's punitive damage award is somewhat limited because that amount is inextricably linked to the "disgorging of profits" theory advanced to the jury by plaintiffs, the proof for which the Supreme Court found "fatally deficient." (*Johnson, supra*, 35 Cal.4th at p. 1212.)

■ The jury's original award of $10 million, although an imperfect measure for reasons stated, *ante*, is approximately 560 times the compensatory damages and "qualifies as a 'breathtaking' multiplier [citation], far outside the 'single-digit neighborhood' [citation] suggested by the high court in *State Farm*." (*Simon, supra*, 35 Cal.4th at p. 1183.) Defendant's course of conduct, established in this case as potentially injurious to a large number of consumers but not established as actually defrauding anyone but the plaintiffs, is not so egregious as to justify this enormous ratio between the punitive and compensatory damages. Indeed, in the absence of proof that the potential for harm was realized on a large scale, we do not find a special justification for punitive damages exceeding a single-digit ratio. (See *State Farm, supra*, 538 U.S. at p. 425.)[7] Nevertheless, (1) the highly reprehensible nature of the conduct, as described earlier, and the (2) state's strong interest in punishment and deterrence that are to be vindicated in order to seek this defendant's future compliance with relevant consumer protection laws, combine to justify punitive damages near the high end of the single-digit range that due process typically permits in the absence of special justification. (See *ibid.*)

We conclude that punitive damages of $175,000, or just less than 10 times the compensatory award, will sufficiently vindicate California's "legitimate interests in punishing unlawful conduct and deterring its repetition." (*BMW, supra*, 517 U.S. at p. 568.)[8]

---

[7] Amicus curiae argues that a single-digit ratio will never deter large corporations and will simply become a cost of doing business. In the present case, however, there was no proof that defendant's scheme actually was used to defraud any other consumers or of the scope of any such actual fraud. Thus, the present award must address punishment and deterrence based on potential harm inherent in defendant's formalized scheme. We note, however, the cumulative deterrence arising from repeated punitive damages awards to those who prove they were defrauded but are unable to marshal proof of the scope of defendant's fraud of other consumers: it seems probable that a larger business determined to commit fraud would do so more often that a smaller business determined to commit the same fraud, simply because the larger business has more customers and, hence, more opportunity. The corollary would seem to be that the large business would be sued more often than the small business, because it has injured more consumers. While different considerations might come into play if there were proof of widespread, hard-to-discover fraud by a larger business (thus resulting in high motivation to defraud and concomitantly high need to deter), in this case there is no evidence concerning the scope of undiscovered fraud, so we need not address those considerations here.

[8] Amicus curiae argues that the formal scheme to short-circuit California's lemon law established in this case makes it "difficult to distinguish" this case from *TXO Production Corp. v. Alliance Resources Corp.* (1993) 509 U.S. 443 [125 L.Ed.2d 366, 113 S.Ct. 2711], in which the court affirmed a $10 million punitive damages award where the jury had awarded $19,000 in compensatory damages. Whatever else might be said of *TXO* (for example, that there was no majority opinion and the case did not establish any rule of law), the case provides no guidance here. Here, unlike *TXO*, plaintiffs were not at risk of huge additional injury if defendant's scheme had succeeded: defendant's scheme *did* succeed and the compensatory damages reflected plaintiffs' entire loss, actual and potential. (See *id.* at p. 462 (plur. opn. of Stevens, J.).)

## IV.

### Disposition

The judgment of the trial court is modified to award punitive damages in the total sum of $175,000. As modified, the judgment is affirmed. The parties shall bear their own costs on appeal.

Cornell, J., and Dawson, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 15, 2006, S140847. George, C. J., did not participate therein.