Filed 5/4/16  Bosstick v. Unhold CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| GERALD BOSSTICK, | D067880 |
| Plaintiff, Cross-defendant and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00050931-CU-MC-NC) |
| GERALD UNHOLD et al., | |
| Defendants, Cross-complainants and Respondents. | |


APPEAL from a judgment of the Superior Court of San Diego County, Jacqueline

M. Stern, Judge.  Affirmed.

Klinedinst, Gabe P. Wright, Jamie M. Ritterbeck; Hahn Loeser & Parks and Gabe

P. Wright for Plaintiff, Cross-defendant and Appellant.

Newmeyer & Dillion, Charles S. Krolikowski and Christina M. Lincoln for

Defendants, Cross-complainants and Respondents.

Plaintiff Gerald W. Bosstick appeals a judgment after the trial court denied his

complaint for declaratory relief and granted the cross-complaint of defendants Gerald P.

Unhold and Ian S. McDonald (Defendants) for declaratory relief, finding certain language in an operating agreement between Bosstick and Defendants was ambiguous and construing that language favorably to Defendants. On appeal, Bosstick contends: (1) the trial court erred by concluding the agreement's phrase "initial estimated value" was ambiguous and finding extrinsic evidence supported Defendants' proposed interpretation of that phrase; and (2) in effect, awarding Defendants contract reformation relief.

FACTUAL AND PROCEDURAL BACKGROUND

Defendants are oral and maxillofacial surgeons who in 2004 sought to own and operate their own medical building. In 2004, they approached Bosstick, a commercial real estate developer, who agreed to assist them in financing, permitting, and constructing the building. Bosstick and Defendants, along with a third doctor, Robert McLachlan, decided to form a limited liability company, known as 839 Grand LLC (Company), to acquire, develop, and own land and a building to be constructed on the land. Defendants wanted the option to purchase Bosstick's interest in the Company so that they could become the sole owners and operators of the property. Bosstick had his attorney, Norman Blumenthal, draft an operating agreement for the Company.

On February 28, 2005, the operating agreement (Agreement) for the Company was executed by Bosstick and Defendants (and apparently McLachlan) providing that Bosstick would be its manager and would have a 45.833 percent membership interest, Defendants would jointly have a 45.833 percent interest, and McLachlan would have an 8.334 percent interest. The Agreement provided that Defendants agreed to enter into a lease to rent about 10,000 square feet of space in a building to be constructed and

2

McLachlan agreed to enter into a lease to rent about 2,500 square feet. An additional 2,500 square feet of space would be available for a future tenant who could or could not become a member of the Company. The anticipated size of the building to be constructed was about 15,000 square feet. Section 1.9 of the Agreement defined the term "Building" as "all the improvements, structures, and features now or hereinafter existing, placed, or constructed or installed on the Land." Section 1.34 defined the term "Property" as "the Land together with the Building and any other improvements constructed on such land, including ancillary improvements such as landscaping and parking lots."

Important to this case, section 3.3 of the Agreement provided in relevant part:

> "3.3 Option to Purchase. At any time after 18 months from the date the Notice of Completion has been filed with regard to the Building, [Defendants] shall have the option to purchase [Bosstick's] interest in the Company. . . . The option price shall be determined by an appraiser mutually acceptable to [Bosstick] and [Defendants] who will determine the market value of the property assuming full occupancy, but *in no event shall the market value be less than the initial estimated value of the Property set forth on Exhibit B*. From this fair market value, all existing encumbrances will be deducted to arrive at the net value of the property. The option price for the purchase of [Bosstick's] Membership Interest in the Company will be [Bosstick's] then percentage Membership Interest in the Company multiplied by the net value of the property. . . ." (Italics added.)

An Exhibit B was attached to the Agreement, setting forth specific budget amounts for various costs of developing the property and including an "[e]conomic analysis."[1] That economic analysis provided in relevant part:

---

[1] Although at trial Defendants disputed that Exhibit B was attached to the Agreement at the time they signed it, the trial court found it was attached to the Agreement and Defendants do not challenge that finding on appeal.

"15,000 square feet @ $2.60 NNN/square foot/month=annual income   $468,000
Market value @ 7.75% capitalization rate                                $6,038,000."

Exhibit B was prepared by Bosstick, but attached to the Agreement by Blumenthal.

On June 20, 2005, a first amendment to the Agreement was executed by the Company's members, providing for the withdrawal by McLachlan as a member.  It provided that thereafter Bosstick would have a 50 percent membership interest and Defendants would also have a 50 percent interest.

On July 25, 2005, an office lease was executed by Defendants and the Company pursuant to which Defendants agreed to lease for 15 years 11,400 square feet of space in the building to be constructed by the Company with minimum basic annual rent of $403,560, which is, in effect, a rental rate of $2.95 per square foot per month (i.e., $403,560 divided by 11,400 square feet and divided again by 12 months).  On April 1, 2009, after construction was completed, Defendants moved into the building and began paying monthly rent.

In late 2012, Defendants exercised their option to purchase Bosstick's interest in the Company pursuant to the Agreement.  However, Bosstick and Defendants disagreed regarding the appraised fair market value of the Property and Bosstick's claim that regardless of the Property's appraised value, a minimum, or "floor," value of $6,038,000 applied pursuant to section 3.3 of, and Exhibit B to, the Agreement.

In May 2013, Bosstick filed a complaint against Defendants seeking dissolution of the Company.  In March 2014, Defendants filed a cross-complaint against Bosstick alleging causes of action for declaratory relief and various torts.  In May, Defendants

4

filed an amended cross-complaint alleging the same causes of action. They sought a declaration that they were entitled to purchase Bosstick's interest in the Company based on the current fair market value of the Property without a "floor value," and, alternatively, that any "floor value" is equal to about $5,000,000 and not $6,000,000. In November, Bosstick filed a first amended complaint seeking declaratory relief in the form of a declaration that the value of the Property for purposes of Defendants' option to purchase his interest was not less than the floor value established by the Agreement.

After trial, the jury returned verdicts in Bosstick's favor on all of Defendants' tort causes of action. On the parties' causes of action for declaratory relief, the trial court denied Bosstick's request and granted Defendants' request, finding the Agreement contained a floor value of the Property for purposes of their purchase of Bosstick's interest in the Company and that floor value was $5,207,225. In its statement of decision, the court first found that section 3.3 and Exhibit B were part of the Agreement. It then considered the language of section 3.3 and Exhibit B, together with extrinsic evidence proffered by the parties, and concluded section 3.3's phrase "initial estimated value" was ambiguous and found, based on that language and evidence, the parties intended that Exhibit B set forth a formula for calculating the floor value, or initial estimated value, of the Property. It further found the parties intended to insert into that formula the total square footage of the building actually built (i.e., 11,400 square feet) and the monthly rent Defendants actually paid (i.e., $2.95 per square foot). Using those figures and the stated 7.75 percent capitalization rate, the court calculated that the formula resulted in a floor value of $5,207,225. The court entered judgment for Defendants on their

5

declaratory relief cause of action, finding the floor value of the Property for purposes of their purchase of Bosstick's interest was $5,207,225. Bosstick timely filed a notice of appeal.

DISCUSSION

I

*Rules for Contract Interpretation and Standards of Review*

*Rules for contract interpretation.* "The purpose of the law of contracts is to protect the reasonable expectations of the parties." (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 475.) "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Civ. Code, § 1636.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Civ. Code, § 1639.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," . . . controls judicial interpretation. [Civ. Code, § 1638.]' [Citations.] . . . [L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19.) Interpretation of a contract "must be fair and reasonable, not leading to absurd conclusions." (*Transamerica Ins. Co. v. Sayble* (1987) 193 Cal.App.3d 1562, 1566.) "The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable."

6

(*Strong v. Theis* (1986) 187 Cal.App.3d 913, 920-921.)  Civil Code section 1643 provides: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."  In the event other rules of interpretation do not resolve an apparent ambiguity or uncertainty, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."  (Civ. Code, § 1654.)

*Admission of parol or extrinsic evidence; standards of review*.  If a contract is ambiguous on its face, parol or extrinsic evidence is admissible to interpret the contract.  (*Severns v. Union Pacific Railroad Co.* (2002) 101 Cal.App.4th 1209, 1214.)  Furthermore, a contract may be latently ambiguous if its language appears clear on its face, but parol or extrinsic evidence shows it is reasonably susceptible to two or more interpretations.  (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269.)

Parol or extrinsic evidence on the parties' intended meaning of language in a contract is generally admissible only if it is relevant to show a meaning to which that language is reasonably susceptible.  (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.)  In *Winet*, we stated:

> "The decision whether to admit parol [or extrinsic] evidence involves a two-step process.  First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a

7

party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. [Citation.]

"Different standards of appellate review may be applicable to each of these two steps, depending upon the context in which an issue arises. The trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus the threshold determination of ambiguity is subject to independent review. [Citation.]

"The second step—the ultimate construction placed upon the ambiguous language—may call for differing standards of review, depending upon the parol evidence used to construe the contract." (*Winet v. Price*, *supra*, 4 Cal.App.4th at pp. 1165-1166.)

"When the competent parol [or extrinsic] evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence. [Citation.] However, when no parol evidence is introduced (requiring construction of the instrument solely based on its own language) or when the competent parol evidence is not conflicting, construction of the instrument is a question of law, and the appellate court will independently construe the writing." (*Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1166.) Furthermore, if the extrinsic evidence itself is not conflicting, but "the parties draw conflicting inferences, we will independently draw inferences and interpret the [contract]." (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71.)

Under the substantial evidence standard of review, "we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every

8

reasonable inference, and resolving conflicts in support of the [findings]. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. . . ." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.) To be substantial, the evidence must be of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Id*. at p. 631; *Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100.) However, substantial evidence is not synonymous with *any* evidence. (*Oregel*, at p. 1100; *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)

     *Evidentiary rulings*. A trial court's decision to admit or exclude evidence is generally subject to the abuse of discretion standard of review. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773; *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) In challenging a court's evidentiary ruling on appeal, the appellant has the burden to show the ruling exceeded the bounds of reason or was arbitrary, capricious, or whimsical. (*Estate of Gilkison* (1998)

65 Cal.App.4th 1443, 1450.) Alternatively stated, the appellant must show the ruling is " 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon*, at p. 773.)

## II

### *Trial Court's Interpretation of the Agreement*

Bosstick contends the trial court erred by concluding the phrase, "initial estimated value," in section 3.3 of the Agreement was ambiguous and then finding extrinsic evidence supported Defendants' proposed interpretation of that phrase.

### A

At trial, the Agreement and Exhibit B were admitted in evidence. The first amendment to the Agreement and the office lease were also admitted. The court also admitted various e-mails between the parties during 2012 and 2013 discussing their positions on the option price and whether a floor value existed and, if so, what that floor value was. The court heard Bosstick's testimony that it was his understanding the Agreement and Exhibit B set a floor price of $6,038,000. Bosstick also testified it "was my clear intent at the time" of the Agreement that a formula be used to calculate the floor value. He conceded that the 15,000 square foot building included in his Exhibit B formula was not constructed, nor was its $2.60 per square foot monthly rent implemented. He further conceded it was possible that Exhibit B may have been an initial estimate of the budget. The court also heard Unhold's testimony that Defendants disputed that a floor value existed, but, if one did exist, then Bosstick's formula would be used to calculate it.

10

Considering the Agreement and Exhibit B, together with extrinsic evidence regarding the parties' contractual intent, the trial court concluded the phrase, "initial estimated value," in section 3.3 of the Agreement was ambiguous and then found, based on that language and the extrinsic evidence, the parties intended that Exhibit B set forth a formula for calculating the floor value, or initial estimated value, of the Property. It further found the parties intended to insert into that formula the total square footage of the building actually built (i.e., 11,400 square feet) and the monthly rent Defendants actually paid (i.e., $2.95 per square foot). Using those figures and the stated 7.75 percent capitalization rate, the court calculated that the formula resulted in a floor value of $5,207,225.

B

Contrary to Bosstick's assertion, we conclude, like the trial court, the phrase "initial estimated value" in section 3.3 of the Agreement is ambiguous as a matter of law. Independently considering the contractual language, we conclude the phrase, "initial estimated value," is reasonably susceptible to two alternative meanings. The language is ambiguous on its face. Although section 3.3 of the Agreement sets the floor value of the option price at "the initial estimated value of the Property set forth on Exhibit B," the Exhibit B attached to the Agreement does *not* contain the phrase, "initial estimated value." Rather, Exhibit B includes the title, "[e]conomic analysis," followed by a formula that uses certain factors that result in a "[m]arket value" of $6,038,000. Also, section 3.3 refers to "the initial estimated value of the *Property*." (Italics added.) Section 1.34 of the Agreement defines "Property" as "the Land together with the *Building* and any other

11

improvements *constructed* on such land . . . ." (Italics added.) Section 1.9 of the

Agreement defines "Building" as "all the *improvements*, structures, and features now or

hereinafter existing, placed, *constructed* or installed on the Land." (Italics added.)

Considering only the above language of the Agreement and Exhibit B, we

conclude the phrase "initial estimated value of the Property set forth on Exhibit B" is

reasonably susceptible to two alternative interpretations. First, that phrase could mean

the estimated market value of the Property as the parties then anticipated constructing in

the future (i.e., a fixed value of $6,038,000, based on the Exhibit B formula with the

anticipated 15,000 square foot building with the anticipated monthly rent of $2.60 per

square foot). Or, second, that phrase could mean the estimated market value of the

Property as actually constructed in the future, using the Exhibit B formula together with

the square footage of the building actually constructed and the actual monthly rent for

that building (i.e., a value that would not be fixed until construction was completed in the

future and the actual square footage and monthly rent were known). Under that latter

interpretation, the initial estimated value would be calculated in the future based on the

formula set forth in Exhibit B, using the actual square footage of the Building and the

actual monthly rent for the Building. Contrary to Bosstick's assertion, the language of the

Agreement and Exhibit B is *not* plain, clear, and susceptible to only one reasonable

interpretation (i.e., his suggested interpretation that the initial estimated value of the

Property was fixed at $6,038,000 even though the Building had yet to be constructed).

Rather, we conclude, as a matter of law, the phrase, "initial estimated value of the

12

Property set forth on Exhibit B," as used in section 3.3 of the Agreement is ambiguous on its face.

C

Contrary to Bosstick's assertion, the trial court properly considered extrinsic evidence first, provisionally, to determine whether the phrase "initial estimated value" was reasonably susceptible to two alternative meanings and, second, as evidence admitted to decide the ultimate factual question of its proper interpretation.  The extrinsic evidence presented by the parties included the first amendment to the Agreement pursuant to which McLachlan withdrew as a member of the Company.  That amendment was executed by the parties less than four months after the Agreement.  It provided that McLachlan was "release[d] of his leasing requirement as set forth in the . . . Agreement . . . ."  That amendment therefore released McLachlan from his obligation under section 3.1.2 of the Agreement to enter into a lease to rent about 2,500 square feet.  It can be reasonably inferred from that amendment releasing McLachlan from his lease obligation that the size of the building to be constructed thereafter would be reduced proportionately (i.e., from 15,000 square feet to 12,500 square feet), as 2,500 square feet of space for McLachlan as a tenant would no longer be required.

Other extrinsic evidence included the office lease executed by Defendants and the Company (with Bosstick signing it as the Company's manager) about five months after the Agreement.  Pursuant to that lease, Defendants agreed to lease for 15 years 11,400 square feet of space in the building to be constructed by the Company with minimum basic annual rent of $403,560 (i.e., a rental rate of $2.95 per square foot per month).  It

13

can be reasonably inferred from that lease that the building the parties then anticipated constructing was reduced from its initial anticipated size of 15,000 square feet to only 11,400 square feet to accommodate Defendants as its sole tenants. Furthermore, Exhibit B's initial anticipated monthly rent of $2.60 per square foot was increased to an actual monthly rent of $2.95 per square foot to be paid by Defendants pursuant to the lease.

Additional extrinsic evidence consisted of testimony that Defendants moved into the building in April 2009 after its completion and began paying monthly rent. Also, the parties did not dispute that the size of the building actually constructed was 11,400 square feet. Other extrinsic evidence included various e-mails between the parties during 2012 and 2013 discussing their positions on the option price and, in particular, whether a floor value existed and, if so, what that floor value was. Although Bosstick testified it was his understanding the Agreement and Exhibit B set a floor price of $6,038,000, he also testified it "was my clear intent at the time" of the Agreement that a formula be used to calculate the floor value. He conceded that the 15,000 square foot building included in his Exhibit B formula was not constructed, nor was its $2.60 per square foot monthly rent implemented. He further conceded it was possible that Exhibit B it may have been an initial estimate of the budget. Unhold testified that Defendants disputed a floor value existed, but, if one did exist, then Bosstick's formula would be used to calculate it.

Provisionally considering that extrinsic evidence together with the language of the Agreement and Exhibit B, we again conclude, as the trial court implicitly did, that the phrase "initial estimated value of the Property set forth on Exhibit B" is reasonably susceptible to two alternative interpretations. As we concluded above, that phrase is

14

reasonably susceptible to the interpretation proffered by Bosstick (i.e., it is a fixed value of $6,038,000 as shown on Exhibit B). Alternatively, that phrase is also reasonably susceptible to an interpretation that the parties intended it to set forth a value to be calculated using the formula shown on Exhibit B, together with factors based on the square footage of the building actually constructed and the actual monthly rent for that building. Given the ambiguity of that phrase based on its provisional consideration of the extrinsic evidence, the trial court properly admitted that evidence to make its ultimate factual determination of the parties' intent regarding the meaning of that phrase at the time of the Agreement.

D

Contrary to Bosstick's assertion, we conclude there is substantial evidence to support the trial court's factual finding that the parties intended the phrase "the initial estimated value of the Property set forth on Exhibit B" to mean the value of the Property, as actually constructed in the future, based on the formula set forth on Exhibit B, using factors based on the square footage of the building actually constructed and its actual monthly rent. The court found the parties intended to insert into the Exhibit B formula the total square footage of the building actually built (i.e., 11,400 square feet) and the monthly rent Defendants actually paid (i.e., $2.95 per square foot). Using those figures and the stated 7.75 percent capitalization rate, the court calculated that the formula resulted in a floor value (or initial estimated value) of $5,207,225.

The extrinsic evidence described above strongly weighs in favor of the trial court's interpretation of the phrase in question. At the time the Agreement was executed, there

15

were no final plans for construction of the building and no lease had been executed by its future tenants. It can be reasonably inferred the parties entered into the Agreement with the understanding that their plans for construction of the building at that time, along with the monthly rent to be paid by future tenants, were subject to change. Events subsequent to the Agreement show exactly how those plans changed soon afterward. McLachlan withdrew as a member of the Company and as a future tenant of 2,500 square feet of space in the building to be constructed. Defendants executed a lease with the Company to rent 11,400 square feet of space in the building to be constructed at a monthly rent of $2.95 per square foot. The size of the building actually constructed ultimately was 11,400 square feet, not 15,000 square feet as initially planned at the time of the Agreement.

Also, the Agreement defined "Building" and "Property" in terms of buildings or improvements actually *constructed* on the land. Therefore, the court could reasonably infer from that evidence that the parties intended section 3.3 of the Agreement, along with Exhibit B, to set forth a formula by which a minimum, or floor, value for the option price would be calculated, using factors based on the size of the building actually constructed and the actual monthly rent for that building. The court reasonably rejected Bosstick's proposed interpretation that the parties intended the Agreement and Exhibit B to set forth a fixed value (i.e., $6,038,000), whether or not per the Exhibit B formula with factors based on the parties' plans at the time regarding the size of the building to be constructed and their plans for its monthly rent. Bosstick testified it "was my clear intent at the time" of the Agreement that a formula be used to calculate the floor value. The

16

court reasonably inferred it was the parties' intent at the time of the Agreement to use the formula set forth on Exhibit B, and, rather than using their estimates or plans at that time for the building and its rent, using the size of the building actually constructed (i.e., 11,400 square feet) and its actual monthly rent (i.e., $2.95 per square foot). Therefore, there is substantial evidence to support the court's calculation of the floor value, or initial estimated value, of the Property to be $5,207,225, using the Exhibit B formula and the factors based on the building actually constructed and its actual monthly rent.[2]

E

Bosstick also asserts the trial court abused its discretion by admitting evidence of the 2012 and 2013 e-mails between the parties. He argues the trial court erroneously admitted Exhibits 127, 128, and 143 because those e-mail communications constituted settlement negotiations and should have been excluded pursuant to Evidence Code

---

[2]    Contrary to Bosstick's assertion, the trial court's finding regarding the parties' intent did not involve any "rewriting" of the Agreement and Exhibit B, but merely involved its finding regarding which one of two reasonably susceptible interpretations it should give to the ambiguous language contained in those documents. (Cf. *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1078; *Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co.* (1964) 228 Cal.App.2d 810, 815, 817.) Likewise, we reject Bosstick's assertion the trial court erred by applying a course of performance analysis in deciding the parties' intent. Although the course of performance evidentiary rule was cited in the court's statement of decision in discussing principles of contract interpretation, the court did not appear to thereafter cite any particular course of performance by the parties on which it relied in interpreting the ambiguous language. In any event, Bosstick has not carried his burden on appeal to show it is reasonably probable he would have obtained a more favorable result had the court not considered the parties' course of performance. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

17

section 1152.[3]  That statute provides that evidence of a person's offers to compromise and other statements made in negotiating a settlement are inadmissible to prove that person's liability to another person who has sustained a loss or damage.  (§ 1152, subd. (a); *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1475.)

However, Bosstick did *not*, for the most part, object below to admission of the above exhibits on the specific ground of inadmissible settlement negotiations under section 1152.  Rather, in objecting to admission of Exhibit 127, he argued that e-mail communication was inadmissible on the grounds of lack of foundation and hearsay.  The trial court implicitly overruled his objection on those grounds and admitted a redacted version of Exhibit 127 in evidence that included only Bosstick's November 8, 2012, e-mail communication.[4]  Defendants' counsel later offered in evidence the remainder of Exhibit 127, which consisted of Unhold's e-mail to Bosstick dated November 7, 2012.  Bosstick objected to admission of that part of Exhibit 127 on the grounds of relevance and "settlement communication per [section] 1152."  The court disagreed that Unhold's e-mail constituted settlement negotiations and admitted that additional portion of Exhibit 127 in evidence.  In objecting to admission of Exhibit 128, Bosstick argued that e-mail communication was inadmissible on the grounds of lack of foundation and relevance.  The court implicitly overruled his objection on those grounds and admitted Exhibit 128 in

---

3     All subsequent statutory references are to the Evidence Code.

4     Exhibit 127 was redacted to include only Bosstick's e-mail dated November 8, 2012, which appeared on the first page.

18

evidence.  Regarding Exhibit 143, the record shows Defendants' counsel showed it to Bosstick on cross-examination and Bosstick testified he wrote it and suggested to McDonald there was a formula to determine the floor value.  Later, Defendants' counsel showed Exhibit 143 to Unhold and described its content.  However, although Exhibit 143 was identified, Bosstick does not cite to a specific part of the record showing Defendants offered it in evidence and the court admitted it.  On the contrary, based on our review of the record, it appears Exhibit 143 was never admitted in evidence.[5]

Section 353, subdivision (a), provides that no judgment shall be reversed based on erroneous admission of evidence unless the record shows "an objection . . . was timely made and so stated as to make clear the specific ground of the objection . . . ."  Under that statute, a party's failure to make a timely and specific objection on the ground asserted on appeal makes that ground not cognizable on appeal.  (*People v. Partida* (2005) 37 Cal.4th 428, 433-434.)  "An objection to evidence must generally be preserved by specific

---

[5]     Accordingly, we need not address whether the trial court erred by overruling Bosstick's objection to admission of Exhibit 143 on the grounds of relevancy and section 1152.  Nevertheless, assuming the court admitted Exhibit 143 in evidence, we conclude, as we do regarding the other exhibits, Bosstick has not carried his burdens to show the court erred by concluding Exhibit 143 did not contain inadmissible settlement communications within the meaning of section 1152 and that it is reasonably probable he would have obtained a more favorable verdict had the court not made that purported error.  To the extent the court cited Exhibit 143 in its statement of decision, that exhibit merely provided cumulative evidence of the parties' intent to use the Exhibit B formula based on the square footage of the building actually constructed and its actual monthly rent.  If the court had excluded that exhibit from its consideration, we nevertheless would conclude there remains substantial evidence to support the court's finding regarding the parties' intent.  Bosstick has not carried his burden on appeal to show that purported error was prejudicial.

19

objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike stating specific or different grounds." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22.)

Based on our review of the record, we conclude Bosstick waived or forfeited any error by the trial court in admitting the redacted portion of Exhibit 127 and all of Exhibit 128 based on section 1152 because he did not timely object to admission of that evidence on that specific ground. His objections to those exhibits on grounds of lack of foundation, hearsay, and/or relevance were inadequate to raise the ground of inadmissible evidence of settlement negotiations under section 1152. (Cf. *People v. Demetrulias*, *supra*, 39 Cal.4th at p. 21 [relevance objection does not alert court to claim that testimony is inadmissible character evidence].) Accordingly, we need not, and do not, address Bosstick's assertion that those exhibits were inadmissible under section 1152. To the extent Bosstick asserts the court erred by admitting the additional, unredacted portion of Exhibit 127 that contained Unhold's November 7, 2012, e-mail communication, we conclude he timely objected to that evidence on the ground of section 1152, but he nevertheless has not carried his burden on appeal to show the trial court erred by concluding Unhold's e-mail did not constitute settlement negotiations under section 1152. Because his opening brief does not quote any portion of that evidence or otherwise set forth its substance, he has not carried his burden on appeal to show that evidence constituted inadmissible evidence of settlement negotiations under section 1152.

20

In any event, assuming arguendo Bosstick did not forfeit or waive his assertion that the trial court erred by admitting Exhibits 127 and 128 and carried his burden to show the court erred by admitting those exhibits, he nevertheless has not made any attempt, much less carried his burden on appeal, to persuade us it is reasonably probable he would have received a more favorable verdict had the court not admitted those exhibits in evidence. (Evid. Code, § 353, subd. (b); *People v. Watson*, *supra*, 46 Cal.2d at p. 836; *Zhou v. Unisource Worldwide*, *supra*, 157 Cal.App.4th at p. 1480.) Alternatively stated, we conclude the purported errors by the trial court in admitting those exhibits did not cause a miscarriage of justice. (Evid. Code, § 353, subd. (b); *Zhou*, at p. 1480.)

### III

### *Reformation*

Bosstick also contends the trial court erred by, in effect, awarding Defendants contract reformation relief. However, the trial court's statement of decision expressly addressed, and rejected, Bosstick's argument that its interpretation of the ambiguous language of the Agreement and Exhibit B constituted reformation of those documents. The court stated it did not make any finding of fraud or mistake, which is required for the remedy of reformation. More importantly, the court stated its interpretation of the phrase "initial estimated value" in section 3.3 of the Agreement did not require reformation, or rewriting, of the Agreement and that it did not add any language to, or remove any language from, the Agreement. Rather, the court stated it merely interpreted the ambiguous language contained in the Agreement. We agree with the trial court's

21

reasoning in rejecting Bosstick's reformation argument and adopt its conclusion that its finding did not award Defendants the remedy of reformation.

IV

*Defendants' Request for Sanctions*

Defendants request that we impose sanctions on Bosstick for his omission of three exhibits that were attached to their amended cross-complaint that he included in his appellant's appendix. They argue Bosstick violated California Rules of Court, rule 8.124(g) by that omission. We have considered, and now deny, their request for imposition of sanctions on Bosstick.

DISPOSITION

The judgment is affirmed. Defendants are entitled to costs on appeal.


McDONALD, J.

WE CONCUR:


NARES, Acting P. J.


IRION, J.

22